| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| M. Jonathan Hayes (Bar No. 90388)<br>Matthew D. Resnik (Bar No. 182562)<br>Roksana D. Moradi (Bar No. 266572)<br>SIMON RESNIK HAYES LLP<br>15233 Ventura Blvd., Suite 250<br>Sherman Oaks, CA 91403<br>Telephone: (818) 783-6251<br>Facsmile: (818) 82704919<br>jhayes@SRHLawFirm.com<br>matthew@SRHLawFirm.com<br>roksana@SRHLawFirm.com<br><br>☒ *Attorney for Movant*<br>☐ *Movant appearing without attorney* | |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

| In re:<br><br>CHRISTOPHER SMITH,<br><br><br><br><br><br><br>Debtor(s) | CASE NO.: 2:14-bk-19737-WB<br><br>CHAPTER: 11 |
|---|---|
| | **NOTICE OF MOTION AND MOTION FOR ORDER DETERMINING VALUE OF COLLATERAL**<br>**[11 U.S.C. § 506(a), FRBP 3012]** |
| | This motion is being made under **ONLY ONE** of the following notice procedures:<br>☐ **No hearing unless requested under LBR 9013-1(o)(4);**<br>☒ **Hearing set by Movant: LBR 9013-1(d);**<br>☐ **Hearing on Shortened Notice: LBR 9075-1(b); or**<br>☐ **Hearing on Emergency Basis: LBR 9075-1(a).**<br><br>DATE: 12/11/2014<br>TIME:  11:00 am<br>COURTROOM: 1375<br>PLACE: 255 E. Temple Street<br>           Los Angeles, CA 90012 |

**Creditor Name** *(Insert name of creditor holding collateral to be valued):*  Chase Bank,NA,  and 

their Successors and/or Assigns 

1.  **PLEASE TAKE NOTICE THAT** Christopher Smith                                                    (Movant)
    requests an order valuing the collateral described below.  This motion does not request lien avoidance (see LBR forms F 4003 for lien avoidance involving principal residences and judicial liens).

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California

*June 2013*                                        Page 1                               **F 3012-1.MOTION.VALUATION**

2. **NOTICE PROVISIONS AND DEADLINES FOR FILING AND SERVING A WRITTEN RESPONSE:** Your rights might be affected by this Motion. You may want to consult an attorney.  Refer to the box checked below for the deadline to file and serve a written response. If you fail to timely file and serve a written response, the court may treat such failure as a waiver of your right to oppose the Motion and may grant the requested relief.  You must serve a copy of your opposition upon the Movant and the Movant's attorney and the United States trustee, and also serve a copy on the judge pursuant to LBR 5005-2(d) and the Court Manual.

a. ☐ **No Hearing Scheduled; Notice Provided Under LBR 9013-1(o):** This Motion is filed by the Movant pursuant to LBR 9013-1(o), which provides for granting of motions without a hearing.  The full Motion is attached, including the legal and factual grounds upon which the Motion is made.  If you wish to oppose this Motion, you must file a written response and request for hearing with the court and serve it as stated above **no later than 14 days after the date stated on the Proof of Service of this Motion** plus 3 additional days if you were served by mail, electronically, or pursuant to F.R.Civ.P. 5(b)(2)(D), (E), or (F). Your opposition must comply with LBR 9013-1(f) and (o).

b. ☒ **Hearing Set by Movant; Notice Provided Under LBR 9013-1(d):** This Motion is set for hearing on at least 21 days of notice pursuant to LBR 9013-1(d).  The full Motion and supporting documentation are attached, including the legal and factual grounds upon which the Motion is made.  If you wish to oppose this Motion, you must file a written response with the court and serve it as stated above **no later than 14 days prior to the hearing**.  Your response must comply with LBR 9013-1(f).  The undersigned hereby verifies that the hearing date and time selected were available for this type of Motion according to the judge's self-calendaring procedures [LBR 9013-1(b)].

c. ☐ **Hearing Requested on Shortened Notice under LBR 9075-1(b):** Movant has filed a separate motion asking the court to set a hearing on shortened notice, titled Application for Order Setting Hearing on Shortened Notice (Application).  If the court grants the Application, the Movant will serve you with another document providing notice. The deadline to file and serve a written response will be contained in this document.  If the court denies the Application, the Movant will provide written notice of a regular hearing date or other proposed disposition of this motion.

d. ☐ **Hearing Requested on Emergency Basis under LBR 9075-1(a):  Hearing Requested on Emergency Basis under LBR 9075-1(a):**  Movant has contacted the court and requested an emergency hearing on less than 48 hours notice.  If the court grants the request, you will receive a separate Notice of Hearing that identifies the deadline for the Movant to file and serve the Motion and the deadline for you to file and serve a written response.  If the court denies the request to set an emergency hearing, the Movant will provide written notice of a regular hearing date or other disposition of this motion and the deadline for filing an opposition.

Date:  11/03/2014

By: /s/ M. Jonathan Hayes
*Signature of Movant or Attorney for Movant*

Name: M. Jonathan Hayes, Esq.
*Print Name of Movant or Attorney for Movant*

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California

## MOTION FOR ORDER DETERMINING VALUE OF COLLATERAL
## PURSUANT TO 11 U.S.C. § 506(a) AND FRBP 3012

**1. The Movant is (*check one*):**
- ☒ The debtor
- ☐ A creditor
- ☐ The trustee
- ☐ The Official Committee of Creditors Holding Unsecured Claims
- ☐ Other (*specify*): _____

**2. The Collateral to be Valued:**

    a. The Movant requests a determination of the value of the following collateral (Collateral).

    ☒ Real Property
       *Street Address:*     10155 Toluca Lake Ave
       *Unit Number:*
       *City, State, Zip Code:*  Toluca Lake, CA 91602

       Legal description or document recording number (including county of recording):
       TRACT NO 8064 LOT 12; APN 2424-024-009

    ☐ Personal Property

       ☐ Vehicle:
       *Year, manufacturer, type, and model:* _____
       *Vehicle Identification Number:* _____
       *Location of vehicle (if known):* _____

       ☐ Equipment:
       *Manufacturer, type, and characteristics:* _____
       *Serial number(s):* _____
       *Location (if known):* _____

       ☐ Other Personal Property (*describe type, identifying information, and location*):
       _____

    ☐ See attached page.

    b. Purpose of the Valuation

       ☒ Treatment of the claim in a plan:

          ☐ Pursuant to 11 U.S.C. § 1322

          ☒ Pursuant to 11 U.S.C. § 1129

          ☐ Other: _____

       ☐ Disposition or use of Collateral pursuant to 11 U.S.C. § 363;

       ☐ Other: (*specify*): _____

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California

*June 2013*                Page 3               **F 3012-1.MOTION.VALUATION**

c. Movant asserts that the value of the Collateral is $ <u>1,550,000.00</u> as of (date): <u>07/31/2014</u>

 *Check one*:

  ☐ Date bankruptcy case was commenced.

  ☒ Other (*specify*): <u>Case Commenced 01/07/2014; Appraisal dated 07/31/2014</u>

## 3. Liens Encumbering the Collateral:

The Collateral is subject to the following liens in the amounts specified securing the debt against the Collateral:

| Names of Lien Holders in Order of Priority | Original Lien Amount | Balance of Lien Amount As of *(applicable date)* 01/07/2014 |
|---|---|---|
| 1st **Lien:** Chase Bank | $ 1,400,000.00 | $ 1,683,000.00 |
| 2nd **Lien:** Chase Bank | $ 150,000.00 | $ 148,614.00 |
| 3rd **Lien:** | $ | $ |

☐ See attached page for additional lien(s).

## 4. Determination of Secured/Unsecured Status:
Based upon paragraphs 2 and 3 above, Movant asserts the following:

| Names of Lien Holders in Order of Priority | Secured Portion of the Claim | Unsecured Portion of the Claim |
|---|---|---|
| 1st **Lien:** Chase Bank | $ 1,550,000.00 | $ 133,000.00 |
| 2nd **Lien:** Chase Bank | $ 0.00 | $ 148,614.00 |
| 3rd **Lien:** | $ | $ |

☐ See attached page for additional lien(s).

## 5. Evidence in Support of Motion:

  a.  Evidence establishing the value of the Collateral:
      ☒ Declaration of the debtor as owner of the Collateral
      ☒ Declaration of the expert witness
          ☒ Certified appraiser
          ☐ Other: _____
      ☐ Declaration of a party who can authenticate a market report (e.g. Kelley Blue Book) pursuant to
         F.R.Evid. 803(17).
      ☒ Other: Property Appraisal (Exhibit "A")

  b.  Evidence establishing the amount of the claims related to the liens encumbering the Collateral
      ☒ Declaration of the debtor as owner of the Collateral
      ☐ Declaration of a witness authenticating a document that is an admissible statement of a party
         opponent (e.g. proof of claim or a recent loan statement) pursuant to F.R.Evid. 801(d)(2).
      ☒ Other: Recorded Deed of Trust for 1st Lien (Exhibit "B") and Proof of Claim for 2nd Lien (Exhibit "C")

  c.  Evidence establishing the priority of the lien encumbering the Collateral
      ☒ Declaration of the debtor as owner of the Collateral
      ☐ Other:

  d.  ☐ Other evidence (*specify*):

---

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California

*June 2013*                                    Page 4                              **F 3012-1.MOTION.VALUATION**

**Based upon the foregoing, Movant requests that this Court value the Collateral as listed in paragraph 2.c. above and that the claims related to the liens encumbering the Collateral, listed in paragraph 3 above, are determined to be secured or unsecured as requested in paragraph 4 above.**

☐ See attached continuation page for additional provisions.

<div align="center">Respectfully submitted,</div>

Date:   11/03/2014

By:    /s/ M. Jonathan Hayes
       *Signature of Movant or Attorney for Movant*

Name:  M. Jonathan Hayes, Esq.
       *Printed Name of Movant or Attorney for Movant*

---

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California

*June 2013*                    Page 5                    **F 3012-1.MOTION.VALUATION**

## DECLARATION OF THE DEBTOR AS OWNER OF THE COLLATERAL IN SUPPORT OF MOTION FOR ORDER DETERMINING VALUE OF COLLATERAL

1. I, *(state debtor's name)* Christopher Smith _____ declare that I am the debtor in this bankruptcy case.

2. I make this declaration of my own personal knowledge and if called as a witness, could and would testify thereto.

3. I am the owner of the collateral listed in paragraph 1 of the Motion for Order Determining Value of Collateral to which this declaration is attached.

4. My opinion of the value of the Collateral is $ 1,550,000.00 _____ as of *(applicable date)* 07/31/2014 _____ based upon my personal knowledge, including but not limited to:

   ☒ Review of an appraisal (do not attach).

   ☐ Knowledge of comparable sales (do not attach).

   ☐ Other: _____

5. As of *(applicable date)* 01/07/2014 _____, the Collateral is subject to the following liens in the amounts specified securing the debt against the Collateral:

| Names of Lien Holders in Order of Priority | Original Lien Amount | Balance of Lien Amount As of *(state applicable date)* 01/07/2014 |
|---|---|---|
| 1st Lien: Chase Bank | $ 1,400,000.00 | $ 1,683,000.00 |
| 2nd Lien: Chase Bank | $ 150,000.00 | $ 148,614.00 |
| 3rd Lien: | $ | $ |

The foregoing balances are established by true and correct copies of filed proofs of claim, or recent loan statements, or other documents attached to this declaration as ~~Exhibit A.~~ Exhibit "B" - Exhibit "C"

6. The purpose of the valuation is to provide for treatment of the claim of:

| Names of Lien Holders in Order of Priority | Secured Portion of the Claim | Unsecured Portion of the Claim |
|---|---|---|
| 1st Lien: Chase Bank | $ 1,550,000.00 | $ 133,000.00 |
| 2nd Lien: Chase Bank | $ 0.00 | $ 148,614.00 |
| 3rd Lien: | $ | $ |

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____
Signature

Christopher Smith _____
Printed Name

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California

June 2013                                    Page 6                        F 3012-1.MOTION.VALUATION

## DECLARATION OF EXPERT WITNESS IN SUPPORT OF
## MOTION FOR ORDER DETERMINING VALUE OF COLLATERAL

I, Jennifer Bosco _____ declare:

1.  I am over 18 years of age, and I am qualified to testify as an expert witness in my capacity as a:

    ☒ Licensed Residential Property Appraiser with license no. AR 037417 _____.

    ☐ Other: _____

    _____

2.  Attached as Exhibit A to this declaration, is my report, which discloses all the data that I have used in forming my opinion.

3.  My opinion of the value of the Collateral is $1,550,000.00 _____ as of *(applicable date)* 07/31/2014 __.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


_____
*Signature*

Jennifer Bosco
*Printed Name*

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California

*June 2013*                              Page 7                        **F 3012-1.MOTION.VALUATION**

# EXHIBIT A

SanWest Appraisals Inc. (818) 613-1797

OSC File No. SRH

SRH

File # JBSK073114A

# APPRAISAL OF REAL PROPERTY

## LOCATED AT

10155 Toluca Lake Ave
Toluca Lake, CA 91602
TRACT NO 8064 LOT 12

## FOR

## OPINION OF VALUE

1,550,000

## AS OF

07/31/2014

## TABLE OF CONTENTS

Invoice ............................................................................................................. 1
Table of Contents/Cover Page ......................................................................... 2
Supplemental Addendum w/sig block .............................................................. 3
Resume ............................................................................................................ 4
License ............................................................................................................. 5
GP Residential ................................................................................................. 6
Additional Comparables 4-6 ............................................................................ 9
GP Residential Certifications Addendum ......................................................... 10
General Text Addendum ................................................................................... 12
Plat Map ........................................................................................................... 14
Location Map .................................................................................................... 15
Subject Photos ................................................................................................. 16
Photograph Addendum ..................................................................................... 17
Photograph Addendum ..................................................................................... 18
Photograph Addendum ..................................................................................... 19
Comparable Photos 1-3 .................................................................................... 20
Comparable Photos 4-6 .................................................................................... 21

**Supplemental Addendum**

File No. JBSK073114A

| Client | Christopher & Patricia Smith | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 10155 Toluca Lake Ave | | | | | | |
| City | Toluca Lake | County | Los Angeles | State | CA | Zip Code | 91602 |
| Owner | Christopher & Patricia Smith | | | | | | |

### Declaration of Jennifer Bosco

I, Jennifer Bosco, hereby declare and state as follows:

1. I am over 18 years of age and a Certified Residential Appraiser with SunWest Appraisals, Inc. Except when based on information and belief, I make this declaration based on facts within my personal knowledge and if called as a witness, could and would testify thereto.

2. I am a duly qualified appraiser.  My California Office of Real Estate Appraisers license number is AR037417. Among other things, I am on the FHA Roster of approved residential appraisers,  I am qualified  and approved to do appraisals for FHA insured loans.

3. I completed an appraisal of the home owned by Christopher and Patricia Smith located at 10155 Toluca Lake Ave, Toluca Lake, CA 91602.  A true and correct copy of the appraisal is attached hereto as Exhibit "A".

4. I have no present of contemplated interest in the real estate that  is the subject of this appraisal report and the fee I received is in no manner contingent upon the value reported.

5. I have no personal interest or bias with respect to the subject matter of the appraisal report, not do I have personal interest or bias with respect to the parties involved in the Motion for Order Valuating Property and Stripping Lien Under 11U.S.C.   506 & 1322(b)(2) and Bankruptcy Rule 3012, Among others, to which my declarations attached.

6. As set forth in the appraisal and incorporated by reference as if set forth in full herein, based on the degree of inspection of the subject property, as indicated therein, defined Scope of Work, Statement of Assumptions and Limiting Conditions, and Appraiser's Certifications, my Opinion of the Market Value, as defined therein, of the real property that is the subject of the appraisal is $1,550,000  as of July 31st  2014.

EXECUTED this 31st day of July 2014, at Los Angeles County, California.

I declare under penalty of perjury  under the laws of the State of California that the foregoing is true and correct.


Jennifer Bosco

| | | | |
|---|---|---|---|
| Signature _____ | | Signature _____ | |
| Name  Jennifer L. Bosco | | Name _____ | |
| Date Signed  July 31, 2014 | | Date Signed _____ | |
| State Certification # _____ | State _____ | State Certification # _____ | State _____ |
| Or State License #   AR037417 | State _____ | Or State License #   AL028996 | State _____ |

**Resume**

# Jennifer Bosco

1449 N Fairview Street. ◆ Burbank, CA 91505 ◆ (818) 613-1767 ◆ jenbosco@hotmail.com

### Professional Licenses

- ◆ Certified Residential
  Appraiser (AR 037417)
- ◆ California Real Estate
  Salesperson (01281552)
- ◆ FHA Approved

### Experience

CERTIFIED RESIDENTIAL APPRAISER                                    (NOV 2004-PRESENT)

- ◆ Perform market valuations of single family residential and 2-4 residential properties.
- ◆ Supervise and manage a staff of 9 appraiser, training and review.
- ◆ Identify market values for complex, proposed and retrospective appraisals.
- ◆ Review valueations completed by other appraiser to confirm accuracy of analysis as risk prevention for wholesale and private lenders.

REALTOR                                                            (MAY 2000-2006)

- ◆ Assist buyers and sellers in the transfer of real property transactions.
  Duties included: detailed area analysis for available and suitable properties, market surveys to dermine market value, negotiate purchase agreements, coordinate transactions including: escorw, title and loan.

PROPERTY MANAGER                                                  (JAN 1998-2001)

- ◆ Oversaw leasing, marketing, rehabilitation as well as fiscal accounts of a residential income property.
- ◆ Increased marke rents by 34% thru salesman ship and cost reffective rehabilitation.
- ◆ Trained new manager.

### Approved Lender List

- ◆ Chase Bank NA
- ◆ Bank of America
- ◆ Augusta Financial.
- ◆ Pacific Bank
- ◆ Bank of Santa Clarita
- ◆ Flagstar
- ◆ Sunwest Bank

### Education and Certifications

- ◆ UNIVERSITY OF SOUTHERN CALIFORNIA – LOS ANGELES, CA
  **Bachelor of Arts-Political Science 1998**

Other File No. SRH

# License

Your complimentary use period has ended. Thank you for using PDF Complete.
Click Here to upgrade to Unlimited Pages and Expanded Features

THIS DOCUMENT CONTAINS A TRUE WATERMARK - HOLD UP TO LIGHT TO SEE "CHAIN LINK"

Business, Transportation & Housing Agency

OFFICE OF REAL ESTATE APPRAISERS

REAL ESTATE APPRAISER LICENSE

Jennifer L. Bosco

has successfully met the requirements for a license as a residential real estate appraiser in the State of California and is, therefore, entitled to use the title:

"Certified Residential Real Estate Appraiser"

This license has been issued in accordance with the provisions of the Real Estate Appraisers' Licensing and Certification Law.

OREA APPRAISER IDENTIFICATION NUMBER: AR 037417

Effective Date: June 8, 2013

Date Expires: June 7, 2015

Jim Martin, Director, OREA

3007578

**RESIDENTIAL APPRAISAL SUMMARY REPORT**

File No.: JBSK073114A

| | |
|---|---|
| Property Address: 10155 Toluca Lake Ave | City: Toluca Lake    State: CA    Zip Code: 91602 |

**SUBJECT**

County: Los Angeles    Legal Description: TRACT NO 8064 LOT 12

Assessor's Parcel #: 2424-024-009

Tax Year: 2013    R.E. Taxes: $ 12,724.78    Special Assessments: $ None    Borrower (if applicable): None (Smith-Owner)

Current Owner of Property: Christopher & Patricia Smith    Occupant: ☒ Owner ☐ Tenant ☐ Vacant ☐ Manufactured Housing

Project Type: ☐ PUD ☐ Condominium ☐ Cooperative ☒ Other (describe) Single Family Residence    HOA: $ None ☐ per year ☐ per month

Market Area Name: Toluca Lake    Map Reference: 563 C4    Census Tract: 1431.00

The purpose of this appraisal is to develop an opinion of: ☒ Market Value (as defined), or ☐ other type of value (describe)

This report reflects the following value (if not Current, see comments): ☒ Current (the Inspection Date is the Effective Date) ☐ Retrospective ☐ Prospective

Approaches developed for this appraisal: ☒ Sales Comparison Approach ☐ Cost Approach ☐ Income Approach (See Reconciliation Comments and Scope of Work)

Property Rights Appraised: ☒ Fee Simple ☐ Leasehold ☐ Leased Fee ☐ Other (describe)

Intended Use: The appraisal report is to be used in estate planning.

**ASSIGNMENT**

Intended User(s) (by name or type): Christopher & Patricia Smith

Client: Christopher & Patricia Smith    Address: On File

Appraiser: Jennifer L. Bosco    Address: On File

**MARKET AREA DESCRIPTION**

| Location: | ☐ Urban ☒ Suburban ☐ Rural | Predominant Occupancy | One-Unit Housing | | Present Land Use | Change in Land Use |
|---|---|---|---|---|---|---|
| Built up: | ☒ Over 75% ☐ 25-75% ☐ Under 25% | | PRICE $(000) | AGE (yrs) | One-Unit 96 % | ☒ Not Likely |
| Growth rate: | ☐ Rapid ☒ Stable ☐ Slow | ☒ Owner 80 | 403 Low 0 | | 2-4 Unit 1 % | ☐ Likely * ☐ In Process * |
| Property values: | ☐ Increasing ☒ Stable ☐ Declining | ☒ Tenant 15 | 4,299 High 92 | | Multi-Unit 2 % | * To: |
| Demand/supply: | ☐ Shortage ☒ In Balance ☐ Over Supply | ☒ Vacant (0-5%) | 1,100 Pred 78 | | Comm'l 1 % | |
| Marketing time: | ☒ Under 3 Mos. ☐ 3-6 Mos. ☐ Over 6 Mos. | ☐ Vacant (>5%) | | | % | |

Market Area Boundaries, Description, and Market Conditions (including support for the above characteristics and trends):    Market conditions are considered
stabilizing with an average to low supply and demand for residential properties.  Marketing times area typically less than 180 days.
Conventional financing is prevalent and readily available at nominal rates.  Seller may pay a portion of a buyer's non-recurring closing costs.
The subject area is comprised of single family dwellings built predominately from 1980-present.  Dwellings vary in age, style, condition and site
size.  Commercial and multi-residential properties are situated along major thoroughfares.  There is good access to support services, schools
and employment.

**SITE DESCRIPTION**

Dimensions: See Plat Map    Site Area: 6,247 Sq.Ft.

Zoning Classification: LAR1    Description: Single Family Residential

Zoning Compliance: ☒ Legal ☐ Legal nonconforming (grandfathered) ☐ Illegal ☐ No zoning

Are CC&Rs applicable? ☐ Yes ☒ No ☐ Unknown    Have the documents been reviewed? ☐ Yes ☒ No    Ground Rent (if applicable) $ /

Highest & Best Use as improved: ☒ Present use, or ☐ Other use (explain)

The subject is considered to be a legal conforming use and the subject's current use as a single family dwelling is it'shighest and best use.

Actual Use as of Effective Date: Single Family Residential    Use as appraised in this report: Single Family Residence

Summary of Highest & Best Use: Highest and best use considered to be single family residential.

| Utilities | Public | Other | Provider/Description | Off-site Improvements | Type | Public | Private | Topography | Level/Avg |
|---|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | ☐ | | Street | | ☒ | ☐ | Size | Average |
| Gas | ☒ | ☐ | | Curb/Gutter | | ☒ | ☐ | Shape | Rectangular |
| Water | ☒ | ☐ | | Sidewalk | | ☒ | ☐ | Drainage | Average |
| Sanitary Sewer | ☒ | ☐ | | Street Lights | | ☒ | ☐ | View | Residential |
| Storm Sewer | ☒ | ☐ | | Alley | None | ☒ | ☐ | | |

Other site elements: ☒ Inside Lot ☐ Corner Lot ☐ Cul de Sac ☐ Underground Utilities ☐ Other (describe)

FEMA Spec'l Flood Hazard Area ☐ Yes ☒ No  FEMA Flood Zone X    FEMA Map # 060137/06037C/1340 F    FEMA Map Date 09/26/2008

Site Comments:    There are no apparent adverse easements, encroachment or other adverse conditions noted at the time of the inspection.
Further there were no obvious environmental hazards present in the improvements, on the site, or in the vicinity of the subject.  For properties
constructed before 1978 asbestos or lead paint could possibly be an issue.  However, no adverse environmental conditions were observed at
the time of the inspection.

**DESCRIPTION OF THE IMPROVEMENTS**

| General Description | | Exterior Description | | Foundation | | Basement ☒ None | Heating | |
|---|---|---|---|---|---|---|---|---|
| # of Units | 1 ☐ Acc.Unit | Foundation | Concrete/Avg | Slab | Foundation | Area Sq. Ft. 0 | Type | Central |
| # of Stories | 2 | Exterior Walls | Plaster | Crawl Space Yes | | % Finished 0 | Fuel | Gas |
| Type ☒ Det. ☐ Att. ☐ | | Roof Surface | Terra Cotta Tile | Basement | None Noted | Ceiling | | |
| Design (Style) Mediterranean | | Gutters & Dwnspts. Yes | | Sump Pump ☒ None | | Walls | Cooling | |
| ☒ Existing ☐ Proposed ☐ Und.Const. | | Window Type | Various/Avg | Dampness ☒ None | | Floor | Central | Central |
| Actual Age (Yrs.) 1929 (85) | | Storm/Screens | None | Settlement | None Noted | Outside Entry | Other | |
| Effective Age (Yrs.) 10 | | | | Infestation | None Noted | | | |

| Interior Description | | Appliances | Attic ☐ None | Amenities | | Car Storage | ☐ None |
|---|---|---|---|---|---|---|---|
| Floors | Various/Avg/Tile/Hrd Wood | Refrigerator ☒ | Stairs ☐ | Fireplace(s) # 1 | Woodstove(s) # 0 | Garage # of cars ( 2 Tot.) | |
| Walls | Plaster/Paint/Wd/Avg | Range/Oven ☒ | Drop Stair ☐ | Patio Patio | | Attach. | |
| Trim/Finish | Wood Block/Avg | Disposal ☒ | Scuttle ☐ | Deck None | | Detach. | |
| Bath Floor | Tile Stone/Avg | Dishwasher ☒ | Doorway ☐ | Porch Porch | | Blt.-In 2 Car | |
| Bath Wainscot | Tile/Avg | Fan/Hood ☒ | Floor ☐ | Fence Block | | Carport | |
| Doors | Wd/Avg/French Glass | Microwave ☒ | Heated ☐ | Pool None | | Driveway 2 Cars | |
| | | Washer/Dryer ☒ | Finished ☐ | | | Surface Concrete | |

Finished area above grade contains: 12 Rooms    4 Bedrooms    4 Bath(s)    2,712 Square Feet of Gross Living Area Above Grade

Additional features:    The energy efficient items are typical for the market area of the subject.

Describe the condition of the property (including physical, functional and external obsolescence):    The subject is a Mediterranean style dwelling located on an
interior residential street.  The site is level w/ front and rear landscape, hardscape and 2 car garage.  The subject is in generally good
condition, quality and appeal.

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.
Form GPRES2 — "WinTOTAL" appraisal software by a la mode, inc. — 1–800-ALAMODE    3/2007

# RESIDENTIAL APPRAISAL SUMMARY REPORT

File No.: JBSK073114A

## TRANSFER HISTORY

| | |
|---|---|
| My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal. | |
| Data Source(s):  NDC Data Source | |
| 1st Prior Subject Sale/Transfer | Analysis of sale/transfer history and/or any current agreement of sale/listing:  The subject has not been listed or |
| Date: | transferred within the last 36 months. |
| Price: | None of the comparables have been listed or transferred within the last 12 months. |
| Source(s): NDC Datasource | |
| 2nd Prior Subject Sale/Transfer | |
| Date: | |
| Price: | |
| Source(s): | |

## SALES COMPARISON APPROACH TO VALUE (if developed)     ☐ The Sales Comparison Approach was not developed for this appraisal.

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | +(-) $ Adjust. | COMPARABLE SALE # 2 | +(-) $ Adjust. | COMPARABLE SALE # 3 | +(-) $ Adjust. |
|---|---|---|---|---|---|---|---|
| Address | 10155 Toluca Lake Ave Toluca Lake, CA 91602 | 4120 W McFarlane Ave Burbank, CA 91505 | | 4337 Clybourn Ave Toluca Lake, CA 91602 | | 4629 Sancola Ave Toluca Lake, CA 91602 | |
| Proximity to Subject | | 0.43 miles E | | 0.18 miles E | | 0.43 miles NW | |
| Sale Price | $ | $ 1,250,000 | | $ 1,425,000 | | $ 1,700,000 | |
| Sale Price/GLA | $       /sq.ft. | $ 487.52 /sq.ft. | | $ 538.35 /sq.ft. | | $ 763.02 /sq.ft. | |
| Data Source(s) | NDC/MLS | Doc#744813/MLS#BB14108872 | | Doc#700967/MLS#14775923 | | Doc#389286/MLS#SR14057295 | |
| Verification Source(s) | Inspection | Local Realtors | | Local Realtors | | Local Realtors | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. |
| Sales or Financing | None | Cnvl/None Noted | | Cnvl/None Noted | | Cnvl/None Noted | |
| Concessions | None | Dom:17 | | Dom:0 | | Dom:21 | |
| Date of Sale/Time | Estate Planning | 07/18/2014 | | 07/08/2014 | | 04/17/2014 | |
| Rights Appraised | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Location | Suburban/Avg | Mod Traffic | +100,000 | Suburban/Avg | | Suburban/Avg | |
| Site | 6,247 Sq.Ft. | 6,301 Sq.Ft. | | 11,065 Sq.Ft. | -25,000 | 13,504 Sq.Ft. | -25,000 |
| View | Residential | Residential/Avg | | Residential/Avg | | Residential/Avg | |
| Design (Style) | Mediterranean | Conventional | | Conventional | | Conventional | |
| Quality of Construction | Average | Average | | Average | | Average | |
| Age | 1929 (85) | 2008 (6) | | 1933 (81) | | 1938 (76) | |
| Condition | Average+ | Average+ | | Average+ | | Average+ | |
| Above Grade | Total 12  Bdrms 4  Baths 4 | Total 8  Bdrms 2  Baths 2.5 | +15,000 | Total 10  Bdrms 3  Baths 4 | | Total 11  Bdrms 3  Baths 3 | +10,000 |
| Room Count | | | | | | | |
| Gross Living Area | 2,712 sq.ft. | 2,564 sq.ft. | +19,000 | 2,647 sq.ft. | +8,000 | 2,228 sq.ft. | +61,000 |
| Basement & Finished | None | None | | None | | None | |
| Rooms Below Grade | None | None | | None | | None | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | FWA/CAC | FWA/CAC | | FWA/CAC | | FWA/CAC | |
| Energy Efficient Items | Typ for Area | Typ for Area | | Typ for Area | | Typ for Area | |
| Garage/Carport | 2 Car Garage | 2 Car Garage | | 2 Car Garage | | 2 Car Garage | |
| Porch/Patio/Deck | Porch/Patio | Porch/Patio | | Porch/Patio | | Porch/Patio | |
| Amenities | None | Bonus Office | -5,000 | Pool/Guest House | -25,000 | Pool/BBQ/FP | -25,000 |
| APN | 2424-024-009 | 2485-013-017 | | 2424-027-018 | | 2420-024-006 | |
| Net Adjustment (Total) | | ☒ +  ☐ - | $ 129,000 | ☐ +  ☒ - | $ -42,000 | ☒ +  ☐ - | $ 21,000 |
| Adjusted Sale Price of Comparables | | Net 10.3 % Gross 11.1 % | $ 1,379,000 | Net 2.9 % Gross 4.1 % | $ 1,383,000 | Net 1.2 % Gross 7.1 % | $ 1,721,000 |

Summary of Sales Comparison Approach     The comparables are all recent verified sales from the immediate market area.  The sales are  similar in style, overall condition, quality and appeal.  The sales bracket the subject's GLA, site size and basic utility.The adjusted sales range is $1,379,000-$1,721,000.  More weight given to standard sales and active listing evenly weighted with closed sales.

Final Estimated Value: $1,550,000.
THE ESTIMATED EXPOSURE TIME IS 45-120 DAYS.
THE APPRAISER HAS NOT APPRAISED THE SUBJECT PROPERTY IN THE PREVIOUS 36 MONTHS.

Appraisal Parameters and Methods: A six month market search was conducted within the subject's neighborhood and similar competing neighborhood(s) for comparable sales, pending sales and properties currently listed for sale.  May properties were reviewed.  To the best of the appraiser's knowledge, the Comparable presented and utilized in this report represent the most relevant data appropriate for the analysis and valuation of the subject property.  The comparable section and valuation analysis is governed by the principle of substitution: a buyer will not pay more for one property than for another that is equally desirable.  When determinable, adjustments for significant differences in improvements were derived by matched paired analysis or abstraction.  When matched pair analysis or abstraction were not possible or practical, bracketing and/or the appraiser's knowledge and experience in the market area are utilized in determining the appropriate adjustment for differences.  Comparable sales were confirmed closed per the information data sources cited in the "scope of the Appraisal."  In the case of discrepancies among data sources the appraisers placed more weight on the MLS data for descriptive information and NDC or Public Records for recording data.

Indicated Value by Sales Comparison Approach $   1,550,000

GP RESIDENTIAL
Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.
Form GPRES2 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE
3/2007

# RESIDENTIAL APPRAISAL SUMMARY REPORT

**COST APPROACH TO VALUE (if developed)**    ☒ The Cost Approach was not developed for this appraisal.

Provide adequate information for replication of the following cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value):

**COST APPROACH**

ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW

| | OPINION OF SITE VALUE | | =$ |
|---|---|---|---|
| Source of cost data: | DWELLING | Sq.Ft. @ $ | =$ |
| Quality rating from cost service:    Effective date of cost data: | | Sq.Ft. @ $ | =$ |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.): | | Sq.Ft. @ $ | =$ |
| | | Sq.Ft. @ $ | =$ |
| | | Sq.Ft. @ $ | =$ |
| | | | =$ |
| | Garage/Carport | Sq.Ft. @ $ | =$ |
| | Total Estimate of Cost-New | | =$ |
| | Less    Physical    Functional    External | | |
| | Depreciation | | =$( ) |
| | Depreciated Cost of Improvements | | =$ |
| | ''As-is'' Value of Site Improvements | | =$ |
| | | | =$ |
| | | | =$ |
| Estimated Remaining Economic Life (if required):    Years | INDICATED VALUE BY COST APPROACH | | =$ |

**INCOME APPROACH**

**INCOME APPROACH TO VALUE (if developed)**    ☒ The Income Approach was not developed for this appraisal.

Estimated Monthly Market Rent $ _____ X Gross Rent Multiplier _____ = $ _____    **Indicated Value by Income Approach** _____

Summary of Income Approach (including support for market rent and GRM):
N/A

**PUD**

**PROJECT INFORMATION FOR PUDs (if applicable)**    ☐ The Subject is part of a Planned Unit Development.

Legal Name of Project:

Describe common elements and recreational facilities:

**RECONCILIATION**

Indicated Value by: Sales Comparison Approach $  1,550,000    Cost Approach (if developed) $ NA    Income Approach (if developed) $

Final Reconciliation   The Sales Comparison approach was solely weighted in determining the final estimate of value, as it best represents typical buyer's and sellers. The Cost approach was not considered  due to the subject's age and location in a fully developed locale. The Income approach was not considered applicable because SFR's in the subject's area are typically purchases for owner use and not income generation.

This appraisal is made ☒ ''as is'', ☐ subject to completion per plans and specifications on the basis of a Hypothetical Condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a Hypothetical Condition that the repairs or alterations have been completed, ☐ subject to the following required inspection based on the Extraordinary Assumption that the condition or deficiency does not require alteration or repair:

☒ This report is also subject to other Hypothetical Conditions and/or Extraordinary Assumptions as specified in the attached addenda.

**Based on the degree of inspection of the subject property, as indicated below, defined Scope of Work, Statement of Assumptions and Limiting Conditions, and Appraiser's Certifications, my (our) Opinion of the Market Value (or other specified value type), as defined herein, of the real property that is the subject of this report is:  $    1,550,000    , as of:    07/31/2014    , which is the effective date of this appraisal. If indicated above, this Opinion of Value is subject to Hypothetical Conditions and/or Extraordinary Assumptions included in this report.  See attached addenda.**

**ATTACHMENTS**

A true and complete copy of this report contains    20    pages, including exhibits which are considered an integral part of the report. This appraisal report may not be properly understood without reference to the information contained in the complete report.

Attached Exhibits:

| ☒ Scope of Work | ☒ Limiting Cond./Certifications | ☐ Narrative Addendum | ☒ Photograph Addenda | ☐ Sketch Addendum |
|---|---|---|---|---|
| ☒ Map Addenda | ☒ Additional Sales | ☐ Cost Addendum | ☐ Flood Addendum | ☐ Manuf. House Addendum |
| ☒ Hypothetical Conditions | ☒ Extraordinary Assumptions | ☒ Plat Map | ☒ Location Map | ☒ Declaration/Resume |

Client Contact:    Chris Smith    Client Name:    Christopher & Patricia Smith

E-Mail:    csmith@csstelevision.com    Address:    On File

**SIGNATURES**

**APPRAISER**    **SUPERVISORY APPRAISER (if required) or CO-APPRAISER (if applicable)**

Appraiser Name:    Jennifer L. Bosco    Supervisory or Co-Appraiser Name:

Company:    SunWest Appraisals, Inc    Company:

Phone: (818) 613-1767    Fax:    Phone:    Fax:

E-Mail: jenbosco@hotmail.com    E-Mail:

Date of Report (Signature):    July 31, 2014    Date of Report (Signature):

License or Certification #:    AR037417    State:  CA    License or Certification #:    State:

Designation:    Certified Residential Appraiser    Designation:

Expiration Date of License or Certification:    06/07/2015    Expiration Date of License or Certification:

Inspection of Subject:  ☒ Interior & Exterior    ☐ Exterior Only    ☐ None    Inspection of Subject:  ☐ Interior & Exterior    ☐ Exterior Only    ☐ None

Date of Inspection:    07/31/2014    Date of Inspection:

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

**GP RESIDENTIAL**    Form GPRES2 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE    3/2007

# ADDITIONAL COMPARABLE SALES

| FEATURE | SUBJECT | COMPARABLE SALE #4 | | COMPARABLE SALE #5 | | COMPARABLE SALE #6 | |
|---|---|---|---|---|---|---|---|
| Address 10155 Toluca Lake Ave | | 4411 Forman Ave | | 10159 Toluca Lake Ave | | | |
| Toluca Lake, CA 91602 | | Toluca Lake, CA 91602 | | Toluca Lake, CA 91602 | | | |
| Proximity to Subject | | 0.15 miles NW | | 0.01 miles NW | | | |
| Sale Price | $ | $ | 1,384,000 | $ | 1,699,000 | $ | |
| Sale Price/GLA | $ /sq.ft. | $ 569.78 /sq.ft. | | $ 544.73 /sq.ft. | | $ /sq.ft. | |
| Data Source(s) | NDC/MLS | Doc#329085/MLS#14741443 | | MLS#14754295 | | | |
| Verification Source(s) | Inspection | Local Realtors | | Local Realtors | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. |
| Sales or Financing | None | Cnvl/None Noted | | Listing | | | |
| Concessions | None | Dom:16 | | ADom:105 | | | |
| Date of Sale/Time | Estate Planning | 04/02/2014 | | Active | | | |
| Rights Appraised | Fee Simple | Fee Simple | | Fee Simple | | | |
| Location | Suburban/Avg | Suburban/Avg | | Suburban/Avg | | | |
| Site | 6,247 Sq.Ft. | 7,599 Sq.Ft. | 0 | 6,250 Sq.Ft. | 0 | | |
| View | Residential | Residential/Avg | | Residential/Avg | | | |
| Design (Style) | Mediterranean | Conventional | | Tudor | | | |
| Quality of Construction | Average | Average | | Average | | | |
| Age | 1929 (85) | 1941 (73) | | 1946 (68) | | | |
| Condition | Average+ | Average+ | | Average+ | | | |
| Above Grade | Total / Bdrms / Baths | Total / Bdrms / Baths | | Total / Bdrms / Baths | | Total / Bdrms / Baths | |
| Room Count | 12 / 4 / 4 | 11 / 3 / 2 | +20,000 | 11 / 4 / 4 | | | |
| Gross Living Area | 2,712 sq.ft. | 2,429 sq.ft. | +35,000 | 3,119 sq.ft. | -51,000 | sq.ft. | |
| Basement & Finished | None | None | | None | | | |
| Rooms Below Grade | None | None | | None | | | |
| Functional Utility | Average | Average | | Average | | | |
| Heating/Cooling | FWA/CAC | FWA/CAC | | FWA/CAC | | | |
| Energy Efficient Items | Typ for Area | Typ for Area | | Typ for Area | | | |
| Garage/Carport | 2 Car Garage | 2 Car Garage | | 2 Car Garage | | | |
| Porch/Patio/Deck | Porch/Patio | Porch/Patio | | Porch/Patio | | | |
| Amenities | None | None | | Pool/Spa/BBQ | -25,000 | | |
| | | | | | | | |
| APN | 2424-024-009 | 2424-006-036 | | 2424-024-008 | | | |
| Net Adjustment (Total) | | ☒ + ☐ - $ | 55,000 | ☐ + ☒ - $ | -76,000 | ☐ + ☐ - $ | |
| Adjusted Sale Price | | Net 4.0 % | | Net 4.5 % | | Net % | |
| of Comparables | | Gross 4.0 % $ | 1,439,000 | Gross 4.5 % $ | 1,623,000 | Gross % $ | |
| Summary of Sales Comparison Approach | See page 2. | | | | | | |

*(Vertical left margin label:* SALES COMPARISON APPROACH *)*

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

GP RESIDENTIAL
Form GPRES2.(AC) — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE
3/2007

## Assumptions, Limiting Conditions & Scope of Work

File No.: JBSK073114A

| Property Address: 10155 Toluca Lake Ave | | City: Toluca Lake | State: CA | Zip Code: 91602 |
|---|---|---|---|---|
| Client: Christopher & Patricia Smith | Address: On File | | | |
| Appraiser: Jennifer L. Bosco | Address: On File | | | |

**STATEMENT OF ASSUMPTIONS & LIMITING CONDITIONS**

— The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

— The appraiser may have provided a sketch in the appraisal report to show approximate dimensions of the improvements, and any such sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size. Unless otherwise indicated, a Land Survey was not performed.

— If so indicated, the appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

— The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

— If the cost approach is included in this appraisal, the appraiser has estimated the value of the land in the cost approach at its highest and best use, and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used. Unless otherwise specifically indicated, the cost approach value is not an insurance value, and should not be used as such.

— The appraiser has noted in the appraisal report any adverse conditions (including, but not limited to, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property, or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property, or adverse environmental conditions (including, but not limited to, the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist.  Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

— The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct.  The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

— The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice, and any applicable federal, state or local laws.

— If this appraisal is indicated as subject to satisfactory completion, repairs, or alterations, the appraiser has based his or her appraisal report and valuation conclusion on the assumption that completion of the improvements will be performed in a workmanlike manner.

— An appraiser's client is the party (or parties) who engage an appraiser in a specific assignment. Any other party acquiring this report from the client does not become a party to the appraiser-client relationship. Any persons receiving this appraisal report because of disclosure requirements applicable to the appraiser's client do not become intended users of this report unless specifically identified by the client at the time of the assignment.

— The appraiser's written consent and approval must be obtained before this appraisal report can be conveyed by anyone to the public, through advertising, public relations, news, sales, or by means of any other media, or by its inclusion in a private or public database.

— An appraisal of real property is not a 'home inspection' and should not be construed as such. As part of the valuation process, the appraiser performs a non-invasive visual inventory that is not intended to reveal defects or detrimental conditions that are not readily apparent. The presence of such conditions or defects could adversely affect the appraiser's opinion of value. Clients with concerns about such potential negative factors are encouraged to engage the appropriate type of expert to investigate.

**The Scope of Work is the type and extent of research and analyses performed in an appraisal assignment that is required to produce credible assignment results, given the nature of the appraisal problem, the specific requirements of the intended user(s) and the intended use of the appraisal report. Reliance upon this report, regardless of how acquired, by any party or for any use, other than those specified in this report by the Appraiser, is prohibited. The Opinion of Value that is the conclusion of this report is credible only within the context of the Scope of Work, Effective Date, the Date of Report, the Intended User(s), the Intended Use, the stated Assumptions and Limiting Conditions, any Hypothetical Conditions and/or Extraordinary Assumptions, and the Type of Value, as defined herein. The appraiser, appraisal firm, and related parties assume no obligation, liability, or accountability, and will not be responsible for any unauthorized use of this report or its conclusions.**

**Additional Comments (Scope of Work, Extraordinary Assumptions, Hypothetical Conditions, etc.):THE GLA WAS DERIVED FROM THIRD PARTY SOURCES DEEMED RELIABLE.  IF DETERMINED NOT TO BE ACCURATE THE APPRAISER RESERVES THE RIGHT TO AMEND THE REPORT ACCORDINGLY.   The appraiser has not performed an valuation on the subject in the previous 36 months.**

**GP RESIDENTIAL**    Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.
Form GPRES2AD — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE                3/2007

## Certifications

| | | | |
|---|---|---|---|
| Property Address:   10155 Toluca Lake Ave | City: Toluca Lake | State: CA | Zip Code: 91602 |
| Client:   Christopher & Patricia Smith | Address:   On File | | |
| Appraiser:   Jennifer L. Bosco | Address:   On File | | |

**APPRAISER'S CERTIFICATION**

**I certify that, to the best of my knowledge and belief:**

— The statements of fact contained in this report are true and correct.

— The credibility of this report, for the stated use by the stated user(s), of the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

— I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

— I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

— My engagement in this assignment was not contingent upon developing or reporting predetermined results.

— My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

— My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice that were in effect at the time this report was prepared.

— I did not base, either partially or completely, my analysis and/or the opinion of value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property, or of the present owners or occupants of the properties in the vicinity of the subject property.

— Unless otherwise indicated, I have made a personal inspection of the property that is the subject of this report.

— Unless otherwise indicated, no one provided significant real property appraisal assistance to the person(s) signing this certification.

**Additional Certifications:**

**DEFINITION OF MARKET VALUE \*:**

Market value means the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated;
2. Both parties are well informed or well advised and acting in what they consider their own best interests;
3. A reasonable time is allowed for exposure in the open market;
4. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

\* This definition is from regulations published by federal regulatory agencies pursuant to Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) of 1989 between July 5, 1990, and August 24, 1990, by the Federal Reserve System (FRS), National Credit Union Administration (NCUA), Federal Deposit Insurance Corporation (FDIC), the Office of Thrift Supervision (OTS), and the Office of Comptroller of the Currency (OCC). This definition is also referenced in regulations jointly published by the OCC, OTS, FRS, and FDIC on June 7, 1994, and in the Interagency Appraisal and Evaluation Guidelines, dated October 27, 1994.

| | | |
|---|---|---|
| Client Contact:   Chris Smith | | Client Name:   Christopher & Patricia Smith |
| E-Mail:   csmith@csstelevision.com | Address:   On File | |

| APPRAISER | SUPERVISORY APPRAISER (if required) or CO-APPRAISER (if applicable) |
|---|---|
| Appraiser Name:   Jennifer L. Bosco | Supervisory or Co-Appraiser Name: |
| Company:   SunWest Appraisals, Inc | Company: |
| Phone:  (818) 613-1767          Fax: | Phone:                    Fax: |
| E-Mail: jenbosco@hotmail.com | E-Mail: |
| Date Report Signed:    July 31, 2014 | Date Report Signed: |
| License or Certification #:    AR037417          State:  CA | License or Certification #:                    State: |
| Designation:    Certified Residential Appraiser | Designation: |
| Expiration Date of License or Certification:    06/07/2015 | Expiration Date of License or Certification: |
| Inspection of Subject:  ☒ Interior & Exterior   ☐ Exterior Only   ☐ None | Inspection of Subject:   ☐ Interior & Exterior   ☐ Exterior Only   ☐ None |
| Date of Inspection:    07/31/2014 | Date of Inspection: |

SIGNATURES

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.
Form GPRES2AD — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE          3/2007

**Supplemental Addendum**                                     File No. JBSK073114A

| Client | Christopher & Patricia Smith | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 10155 Toluca Lake Ave | | | | | | |
| City | Toluca Lake | | County | Los Angeles | State | CA | Zip Code | 91602 |
| Owner | Christopher & Patricia Smith | | | | | | |

**Additional Information:**

PERSONAL PROPERTY: Personal property includes such items as furnishings, artwork, antiques, machinery, and equipment.  No personal property was included in the valuation of the subject.

FEMA FLOOD DATA: Readers/users of this appraisal must note that the FEMA flood hazard information noted herein (in regards tot he subject) can not be guaranteed by the appraisers.  The appraisers are not qualified experts in the determination of flood hazards and make no representations as to the FDMA flood zones or the necessity of flood insurance for the subject.  The reader/user is advised to obtain a separate independent Flood FDMA, unless otherwise noted or included herein as an exhibit.  Flood information noted in this appraisal was obtained from NDC services.

ZONING DATA: Zoning information was derived from NDC or other sources deemed reliable.  However, the accuracy of the data can not be guaranteed.

STRUCTURAL/MECHANICAL DEFECTS: Unless specifically noted, this appraisal is based on the special assumption that the subject does not have any structural or mechanical defects.  It is assumed that all mechanical equipment and appliances are in satisfactory working condition, unless otherwise noted, and that the electrical/plumbing systems are also adequate, unless otherwise noted.  The appraisers are not experts in these areas (not licensed or qualified home inspector) and have not tested the subject to ensure that all of the above is in working condition.  The pest control report (or termite report) and home inspection report if any, were not provided to the appraisers.  Lastly, this appraisal is based on the special assumption that the roof and foundation systems area adequate.  But again, the appraisers are not experts in these fields and have not tested the subject in these regards.

ADVERSE ENVIRONMENTAL CONDITIONS: There were no obvious environmental hazards present in the improvements, on the site or in the vicinity of the subject property that we noted as the time of the inspection.  The value of the property in this report is based on the assumption that the property is not negatively affected by the presence of hazardous substances or detrimental environmental conditions.  The appraisers are not experts in the identification of hazardous substances or detrimental environmental conditions.  It is possible that tests and inspections made by a qualified hazardous substances and environmental expert would reveal the existence of hazardous materials and environmental conditions on or around the subject property that would negatively affect its value.

COMPETENCY STATEMENT: The appraisers have analyzed/appraised the subject's property type before.  The appraisers possess the necessary knowledge and experience to complete this report in conformity with the competency provision of the USPAP.  The appraiser signing on the right, supervised the appraisal process, has made a through review of the work file including the finished report, has recommended changes where appropriate, and concurs with the analyses and value conclusions stated herein.  The appraisers accept full and complete responsibility for the appraisal report.

PURPOSE OF THE REPORT (SCOPE OF THE REPORT): The purpose of this report is to estimate the market value of the subject property.

FUNCTION (INTENDED USE) OF REPORT: The function of this report is for estate planning purposes.  This appraisal report is not intended for use in a mortgage finance transaction.  This report is not intended for any other use or uses and shall be invalid if used for any other function.  Furthermore, this report may only be used by the noted client, as indicated on the top of the appraisal form.  This report may not be given to and may not be utilized by a third party.  The appraisers and appraisal firm will have no obligation to reissue this report to any other party.

REAL PROPERTY INTERESTS DEFINED: A Fee Simple interest is defined as "Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat." [Dictionary of Real Estate Appraisal, 3rd Ed.]

DIGITAL SIGNATURES: This report may contain digitally-reproduced signatures, which are approved by FNMA, GNMA, FHA and HUD.  The A la Mode appraisal software program allows an appraiser to attach a digitally-reproduced signature by entering a secret password known only to the signing appraiser.  Furthermore, after the report is digitally signed, it is locked and cannot be altered by anyone but the

**Supplemental Addendum**

File No. JBSK073114A

| Client | Christopher & Patricia Smith | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 10155 Toluca Lake Ave | | | | | | |
| City | Toluca Lake | County | Los Angeles | State | CA | Zip Code | 91602 |
| Owner | Christopher & Patricia Smith | | | | | | |

signing appraisers. The appraisers accept full responsibility for the appraisal report.

DIGITAL PHOTOGRAPHS: This report may contain digitally-reproduced photographs, which are approved by FNMA, GNMA, FHA, and HUD. The photos have not been altered or enhanced in anyway that would misrepresent the property or mislead the intended user of this report. The appraisers accepts full responsibility for the appraisal.

PROFESSIONAL ASSISTANCE: Claire Levine-Dotson & Sylvia Kelman provided professional assistance in the preparation of this report. They assisted with data input and research and inspection. Claire & Sylvia were directly supervised by Jennifer Bosco.

**Plat Map**

| Client | Christopher & Patricia Smith | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 10155 Toluca Lake Ave | | | | | |
| City | Toluca Lake | County | Los Angeles | State | CA | Zip Code | 91602 |
| Owner | Christopher & Patricia Smith | | | | | |



**Location Map**

| Client | Christopher & Patricia Smith | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 10155 Toluca Lake Ave | | | | | | |
| City | Toluca Lake | | County | Los Angeles | State | CA | Zip Code | 91602 |
| Owner | Christopher & Patricia Smith | | | | | | |



## Subject Photo Page

| Client | Christopher & Patricia Smith | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 10155 Toluca Lake Ave | | | | | |
| City | Toluca Lake | County | Los Angeles | State | CA | Zip Code | 91602 |
| Owner | Christopher & Patricia Smith | | | | | |



**Subject Front**

10155 Toluca Lake Ave
Sales Price
Gross Living Area    2,712
Total Rooms    12
Total Bedrooms    4
Total Bathrooms    4
Location    Suburban/Avg
View    Residential
Site    6,247 Sq.Ft.
Quality    Average
Age    1929 (85)



**Subject Rear**



**Subject Street**

## Photograph Addendum

| Client | Christopher & Patricia Smith | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 10155 Toluca Lake Ave | | | | | |
| City | Toluca Lake | County | Los Angeles | State | CA | Zip Code | 91602 |
| Owner | Christopher & Patricia Smith | | | | | |










## Photograph Addendum

| Client | Christopher & Patricia Smith | | | | |
|---|---|---|---|---|---|
| Property Address | 10155 Toluca Lake Ave | | | | |
| City | Toluca Lake | County Los Angeles | | State CA | Zip Code 91602 |
| Owner | Christopher & Patricia Smith | | | | |










**Photograph Addendum**

Case File No. SRH

| Client | Christopher & Patricia Smith | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 10155 Toluca Lake Ave | | | | | |
| City | Toluca Lake | County | Los Angeles | State | CA | Zip Code 91602 |
| Owner | Christopher & Patricia Smith | | | | | |

 

Case File No. SRH

## Comparable Photo Page

| Client | Christopher & Patricia Smith | | | | |
|---|---|---|---|---|---|
| Property Address | 10155 Toluca Lake Ave | | | | |
| City | Toluca Lake | County | Los Angeles | State CA | Zip Code 91602 |
| Owner | Christopher & Patricia Smith | | | | |



### Comparable 1

4120 W McFarlane Ave
| | |
|---|---|
| Prox. to Subject | 0.43 miles E |
| Sale Price | 1,250,000 |
| Gross Living Area | 2,564 |
| Total Rooms | 8 |
| Total Bedrooms | 2 |
| Total Bathrooms | 2.5 |
| Location | Mod Traffic |
| View | Residential/Avg |
| Site | 6,301 Sq.Ft. |
| Quality | Average |
| Age | 2008 (6) |



### Comparable 2

4337 Clybourn Ave
| | |
|---|---|
| Prox. to Subject | 0.18 miles E |
| Sale Price | 1,425,000 |
| Gross Living Area | 2,647 |
| Total Rooms | 10 |
| Total Bedrooms | 3 |
| Total Bathrooms | 4 |
| Location | Suburban/Avg |
| View | Residential/Avg |
| Site | 11,065 Sq.Ft. |
| Quality | Average |
| Age | 1933 (81) |



### Comparable 3

4629 Sancola Ave
| | |
|---|---|
| Prox. to Subject | 0.43 miles NW |
| Sale Price | 1,700,000 |
| Gross Living Area | 2,228 |
| Total Rooms | 11 |
| Total Bedrooms | 3 |
| Total Bathrooms | 3 |
| Location | Suburban/Avg |
| View | Residential/Avg |
| Site | 13,504 Sq.Ft. |
| Quality | Average |
| Age | 1938 (76) |

Case File No. SRH

## Comparable Photo Page

| Client | Christopher & Patricia Smith | | | | |
|---|---|---|---|---|---|
| Property Address | 10155 Toluca Lake Ave | | | | |
| City | Toluca Lake | County Los Angeles | | State CA | Zip Code 91602 |
| Owner | Christopher & Patricia Smith | | | | |



### Comparable 4

4411 Forman Ave

| | |
|---|---|
| Prox. to Subject | 0.15 miles NW |
| Sale Price | 1,384,000 |
| Gross Living Area | 2,429 |
| Total Rooms | 11 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2 |
| Location | Suburban/Avg |
| View | Residential/Avg |
| Site | 7,599 Sq.Ft. |
| Quality | Average |
| Age | 1941 (73) |



### Comparable 5

10159 Toluca Lake Ave

| | |
|---|---|
| Prox. to Subject | 0.01 miles NW |
| Sale Price | 1,699,000 |
| Gross Living Area | 3,119 |
| Total Rooms | 11 |
| Total Bedrooms | 4 |
| Total Bathrooms | 4 |
| Location | Suburban/Avg |
| View | Residential/Avg |
| Site | 6,250 Sq.Ft. |
| Quality | Average |
| Age | 1946 (68) |

### Comparable 6

| | |
|---|---|
| Prox. to Subject | |
| Sale Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

# EXHIBIT B

## Document Images

Loan Document



**This page is part of your document - DO NOT DISCARD**

**20072140692**    Pages: 026

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

09/18/07 AT 08:00AM

Fee: 85.00
Tax: 0.00
Other: 0.00
Total: 85.00

Title Company

**TITLE(S)** :

L  E  A  D        S  H  E  E  T

**Assessor's Identification Number (AIN)**
To be completed by Examiner OR Title Company in black ink.

**Number of AIN's Shown**

**THIS FORM IS NOT TO BE DUPLICATED**

PRIORITY TITLE
© 2014 CoreLogic. All rights reserved

**Document Images**

Recording Requested by
**United General Title Insurance Company**

Recording Requested By:
WASHINGTON MUTUAL BANK   FA

Return To:
WASHINGTON MUTUAL BANK   FA
2210 ENTERPRISE DR
FLORENCE, SC 29501
DOC OPS M/S FSCE 440

| 09/18/07 |
| --- |
| **20072140692** |

Prepared By:
ANGELA MERLINO

130479

ZCA1
M39

[Space Above This Line For Recording Data]

# DEED OF TRUST

3014512531-057

25

---

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated  SEPTEMBER 11, 2007 , together with all Riders to this document.

**(B) "Borrower"** is  CHRISTOPHER ROBERT SMITH AND PATRICIA RAMISCH SMITH, HUSBAND AND WIFE AS JOINT TENANTS

Borrower's address is  3415 PALM DRIVE, HERMOSA BEACH, CA 90254
. Borrower is the trustor under this Security Instrument.

**(C) "Lender"** is  WASHINGTON MUTUAL BANK, FA

Lender is a  FEDERAL SAVINGS BANK
organized and existing under the laws of  THE UNITED STATES OF AMERICA

---

**CALIFORNIA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**    Form 3005 1/01

–6(CA) (0207)
Page 1 of 15    Initials
VMP MORTGAGE FORMS · (800)521-7291

PRIORITY TITLE

Prepared On : 11/03/2014

PRIORITY
TITLE
© 2014 CoreLogic. All rights reserved

Document Images

Lender's address is 2273 N. GREEN VALLEY PARKWAY, SUITE 14, HENDERSON, NV
89014
Lender is the beneficiary under this Security Instrument.
**(D) "Trustee"** is CALIFORNIA RECONVEYANCE COMPANY, A CALIFORNIA CORP

**(E) "Note"** means the promissory note signed by Borrower and dated SEPTEMBER 11, 2007 .
The Note states that Borrower owes Lender ONE MILLION FOUR HUNDRED THOUSAND AND
00/100                                                                                    Dollars
(U.S. $   1,400,000.00   ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than OCTOBER 01, 2037 .
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights
in the Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late
charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The
following Riders are to be executed by Borrower (check box as applicable):

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] Other(s) [specify] |
| [x] 1-4 Family Rider | [ ] Biweekly Payment Rider | |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as well as
all applicable final, non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a condominium
association, homeowners association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an electronic
terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize
a financial institution to debit or credit an account. Such term includes, but is not limited to,
point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire
transfers, and automated clearinghouse transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or
other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv)
misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or
default on, the Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and
interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.)
and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended
from time to time, or any additional or successor legislation or regulation that governs the same
subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and

07 21406692

-6(CA) (0207)                           Page 2 of 15           Initials          Form 3005 1/01

PRIORITY TITLE                                                     Prepared On : 11/03/2014

PRIORITY TITLE
© 2014 CoreLogic. All rights reserved

Document Images

restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument

### TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the  **COUNTY**                  of  **LOS ANGELES**                              :

        [Type of Recording Jurisdiction]           [Name of Recording Jurisdiction]

    THE LEGAL DESCRIPTION IS ATTACHED HERETO AS A SEPARATE EXHIBIT 'A' AND IS MADE A PART HEREOF.

Parcel ID Number: **2424-024-009**                       which currently has the address of

**10155 TOLUCA LAKE AVE**                                                        [Street]

**TOLUCA LAKE**                          [City]， California **91602**   [Zip Code]

("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record  Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

    **1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the

-6(CA) (0207)                      Page 3 of 15     Initials _____      Form 3005 1/01

Prepared On : 11/03/2014

PRIORITY TITLE
© 2014 CoreLogic. All rights reserved

Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the

CMP—6(CA) (0207)                    Page 4 of 15          Initials                    Form 3005 1/01

PRIORITY TITLE

Prepared On : 11/03/2014

PRIORITY TITLE

© 2014 CoreLogic. All rights reserved

term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Initials

–6(CA) (0207)                    Page 5 of 15                    Form 3005 1/01

PRIORITY TITLE
© 2014 CoreLogic. All rights reserved

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

@MP—6(CA) (0207)          Page 6 of 15          Initials          Form 3005 1/01

PRIORITY TITLE
© 2014 CoreLogic. All rights reserved

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

Initials

—6(CA) (0207)                    Page 7 of 15                    Form 3005 1/01

Prepared On : 11/03/2014

PRIORITY TITLE
© 2014 CoreLogic. All rights reserved

Document Images

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Initials

—6(CA) (0207)                        Page 8 of 15                        Form 3005 1/01

PRIORITY TITLE                                                    Prepared On : 11/03/2014

PRIORITY TITLE
© 2014 CoreLogic. All rights reserved

Document Images

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or

Initials

—6(CA) (0207)                    Page 9 of 15                    Form 3005 1/01

PRIORITY TITLE

Prepared On : 11/03/2014

PRIORITY
TITLE
© 2014 CoreLogic. All rights reserved

loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to

-6(CA) (0207)    Page 10 of 15    Initials:    Form 3005 1/01

© 2014 CoreLogic. All rights reserved

Document Images

make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred

Initials

—6(CA) (0207)                    Page 11 of 15                    Form 3005 1/01

Prepared On : 11/03/2014

PRIORITY TITLE
© 2014 CoreLogic. All rights reserved

Document Images

in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual

**-6(CA)** (0207)                        Page 12 of 15                        Initials _____                        Form 3005 1/01

PRIORITY TITLE
© 2014 CoreLogic. All rights reserved

Document Images

knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee.

—6(CA) (0207)                                        Page 13 of 15                                        Form 3005 1/01

PRIORITY TITLE
© 2014 CoreLogic. All rights reserved

Document Images

ZCA2

Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____     _____ (Seal)
                                                                -Borrower
                                     CHRISTOPHER ROBERT SMITH

PATRICIA RAMISCH SMITH
_____     _____ (Seal)
                                                                -Borrower

_____ (Seal)     _____ (Seal)
                        -Borrower                                   -Borrower

_____ (Seal)     _____ (Seal)
                        -Borrower                                   -Borrower

_____ (Seal)     _____ (Seal)
                        -Borrower                                   -Borrower

—6(CA) (0207)                   Page 14 of 15                   Form 3005 1/01

Prepared On : 11/03/2014

PRIORITY TITLE
© 2014 CoreLogic. All rights reserved

**Document Images**

State of California
County of  LOS ANGELES

} ss.

On September HS 2007                    before me, Breanna M. Lepante,
Notary Public                                                              personally appeared
CHRISTOPHER ROBERT SMITH

16

personally known to me (or proved to me on the basis of satisfactory evidence) to be the
person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s)
acted, executed the instrument.
WITNESS my hand and official seal.

Breanna M. Lepante (Seal)

BREANNA M. LEPANTE
COMM #1506370
NOTARY PUBLIC ● CALIFORNIA
ORANGE COUNTY
Comm. Exp. AUG 8, 2008

-6(CA) (0207)                         Page 15 of 15                         Form 3005 1/01

Initials

G7 2140692

Prepared On : 11/03/2014
PRIORITY TITLE

© 2014 CoreLogic. All rights reserved

Document Images

# Exhibit A

**LEGAL DESCRIPTION**

Real property in the City of Los Angeles, County of Los Angeles, State of California, described as follows:

LOT 12, BLOCK 5 OF TRACT NO. 8064, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 100, PAGES 47 TO 49 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

APN: 2424-024-009

Prepared On : 11/03/2014

PRIORITY TITLE

© 2014 CoreLogic. All rights reserved

Document Images

18

RMTA
M39

## ADJUSTABLE RATE RIDER
### (12-MTA Index - Payment and Rate Caps)

3014512531-057

THIS ADJUSTABLE RATE RIDER is made this ___11TH___ day of SEPTEMBER, 2007 _____, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to __WASHINGTON MUTUAL BANK, FA_____ (the "Lender") of the same date and covering the property described in the Security Instrument and located at

__10155 TOLUCA LAKE AVE, TOLUCA LAKE, CA  91602_____
(PROPERTY ADDRESS)

**THIS RIDER CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __115%____ OF THE ORIGINAL AMOUNT (OR $__1,610,000.00_____). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THE NOTE AND RIDER. A BALLOON PAYMENT MAY BE DUE AT MATURITY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.  INTEREST RATE AND MONTHLY PAYMENT CHANGES**
Interest will be charged on unpaid Principal until the full amount of Principal has been paid  Up until the first day of the calendar month that precedes the first payment due date set forth in Section 3 of the Note, I will pay interest at a yearly rate of __8.458__% Thereafter, until the first Change Date (as defined in Section 4 of this Note) I will pay interest at a yearly rate of __1.700__% The interest rate I will pay will thereafter change in accordance with Section 4 of the Note.

32843 (05-07)                              **Page 1 of 5**                    LRD02USA (Version 2 0)

PRIORITY TITLE
© 2014 CoreLogic. All rights reserved

Document Images

19

3014512531−057

## 4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may further change on the _____1ST_____ day of
_NOVEMBER, 2007_____, and on that day every month thereafter Each such day is
called a "Change Date"

### (B) The Index

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-
Month Average, determined as set forth below, of the annual yields on actively traded United States
Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve
Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H 15)" (the
"Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields
for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of 15 days before each interest rate Change Date is
called the "Current Index". If the Index is no longer available, the Note Holder will choose a new index
which is based upon comparable information. The Note Holder will give me notice of this choice

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding
_THREE AND 525/1000_____         percentage    points
_3.525___% ("Margin") to the Current Index The Note Holder will then round the result of this
addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated
in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date In
the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined The
new Margin will be the difference between the average of the old Index for the most recent three year
period which ends on the last date the Index was available plus the Margin on the last date the old
Index was available and the average of the new Index for the most recent three year period which
ends on that date (or if not available for such three year period, for such time as it is available). This
difference will be rounded to the next higher 1/8 of 1%.

### (D) Interest Rate Limit

My interest rate will never be greater than _TEN AND 40/100_____
percentage points _10.400_% ("Cap"), except that following any sale or transfer of the property
which secures repayment of this Note after the first interest rate Change Date, the maximum interest
rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the
time of such sale or transfer

### (E) Payment Change Dates

Effective every year commencing _____NOVEMBER 01, 2008_____, and on the
same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine

07 2140692

PRIORITY TITLE                                                                 Prepared On : 11/03/2014

PRIORITY TITLE
© 2014 CoreLogic. All rights reserved

Document Images



30145 1253 1—057

the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the Maturity Date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments  The result of this calculation is the new amount of my minimum monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of this Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new minimum monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying  This payment cap applies only to the principal payment and does not apply to any escrow payments Lender may require under the Security Instrument.

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my initial minimum monthly payment may not be based on the interest rate set forth in Section 2 of this Note, since the minimum monthly payment amount changes less frequently than the interest rate and since the minimum monthly payment is subject to the payment limitations described in Section 4(F), my minimum monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the minimum monthly payment is less than the interest portion and I choose to make only the minimum monthly payment, the Note Holder will subtract the minimum monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that my minimum monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Minimum Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to __115%____ of the principal amount originally borrowed  In the event my unpaid Principal would otherwise exceed that __115%____ limitation, I will begin paying a new minimum monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation  The new minimum monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments

**(I) Required Full Monthly Payment**

On the ___F I F T H___  anniversary of the due date of the first monthly payment, and on that same day every ___F I F T H___ year thereafter, my minimum monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F)

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in  the amount of my minimum

32843 (05-07)                         **Page 3 of 5**                         LRD02USC (Version 2 0)

Q7 2148692

PRIORITY TITLE

Prepared On : 11/03/2014

PRIORITY TITLE

© 2014 CoreLogic. All rights reserved

30 145 125 3 1—057

monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower   As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser ·If all or any part of the Property or any interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law  Lender also shall not exercise this option if· (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee, (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Agreement or other obligations related to the Note or other loan document is acceptable to Lender, (c) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (d) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption, and Lender may increase the maximum interest rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument  Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written assumption agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower

32843 (05-07)                              **Page 4 of 5**                    LRD02USD (Version 2 0)

© 2014 CoreLogic. All rights reserved

Document Images

RMT2                                                        30 145 12531−057

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider  Borrower agrees to execute any document necessary to reform this Agreement to accurately reflect the terms of the Agreement between Borrower and Beneficiary or if the original Note, Trust Deed or other document is lost, mutilated or destroyed

_____
CHRISTOPHER ROBERT SMITH

_____
PATRICIA RAMISCH SMITH

_____                    _____

_____                    _____

32843 (05-07)                    **Page 5 of 5**                    LRD02USE (Version 2 0)

Prepared On : 11/03/2014

PRIORITY
TITLE
© 2014 CoreLogic. All rights reserved

Document Images

57US
M39

# 1-4 FAMILY RIDER
(Assignment of Rents)

3014512531-057

THIS 1-4 FAMILY RIDER is made this **11TH** day of **SEPTEMBER** **2007**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to

**WASHINGTON MUTUAL BANK, FA**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**10155 TOLUCA LAKE AVE, TOLUCA LAKE, CA 91602**

[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the

**MULTISTATE 1-4 FAMILY RIDER—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3170 1/01**
Page 1 of 4                                    Initial
⊕-57R (0008)                    VMP MORTGAGE FORMS - (800)521-7291



PRIORITY TITLE
© 2014 CoreLogic. All rights reserved

Document Images

Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B.  USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change  Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C.  SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D.  RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E.  "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F.  BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G.  ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H.  ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only

-57R (0008)                          Page 2 of 4                          Form 3170  1/01

Initials

PRIORITY TITLE

Prepared On : 11/03/2014

PRIORITY TITLE
© 2014 CoreLogic. All rights reserved

Document Images

25

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

I.   **CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

—57R (0008)                              Page 3 of 4        Initials              Form 3170 1/01

07 21406692

Prepared On : 11/03/2014

PRIORITY TITLE

© 2014 CoreLogic. All rights reserved

**Document Images**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_____ (Seal)
-Borrower

**PATRICIA RAMISCH SMITH**

_____ (Seal)
-Borrower

**CHRISTOPHER ROBERT SMITH**

_____ (Seal)     _____ (Seal)
-Borrower                                              -Borrower

_____ (Seal)     _____ (Seal)
-Borrower                                              -Borrower

_____ (Seal)     _____ (Seal)
-Borrower                                              -Borrower

-57R (0008)                Page 4 of 4                Form 3170 1/01

Prepared On : 11/03/2014

**PRIORITY TITLE**

© 2014 CoreLogic. All rights reserved

# EXHIBIT C

**UNITED STATES BANKRUPTCY COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

IN THE MATTER OF:

Christopher Smith

Bankruptcy No. 14-19737
Honorable Julia W. Brand
Chapter 11

                    Debtor(s)

_____/

## CERTIFICATE OF SERVICE FOR PROOF OF CLAIM

      Yausheka H. Colding hereby certifies that on the 16th day of July, 2014, s/he did submit a true and correct copy of the Proof of Claim and Certificate of Service either by electronic notice or by depositing same in a United States Postal Box located in Rochester, Michigan, with the lawful amount of postage affixed thereto and/or by Federal Express Overnight Mail, upon the following:

M Jonathan Hayes
Simon Resnik Hayes LLP
15233 Ventura Blvd Ste 250
Sherman Oaks, CA 91403

Nancy K Curry (TR)
700 S Flower Street, Suite 1215
Los Angeles, CA 90017

Yausheka H. Colding,
Five Lakes Agency, Inc.
Agents for Creditor,
JPMorgan Chase Bank, National Association, successor in interest by purchase from the FDIC as Receiver of Washington Mutual Bank
P.O. Box 80730
Rochester, MI  48308
(855) 824-1000
339210

B 10 (Official Form 10) (04/13)

| UNITED STATES BANKRUPTCY COURT **CENTRAL** DISTRICT OF **CALIFORNIA** | **PROOF OF CLAIM** |
|---|---|

| Name of Debtor: **Christopher Smith** | Case Number: 14-19737 |
|---|---|

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. §503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
**JPMorgan Chase Bank, National Association, successor in interest by purchase from the FDIC as Receiver of Washington Mutual Bank**

**COURT USE ONLY**

Name and address where notices should be sent:
Five Lakes Agency, Inc.
JPMorgan Chase Bank, National Association, successor in interest by purchase from the FDIC as Receiver of Washington Mutual Bank
P.O. Box 80730
Rochester, MI 48308
Telephone Number: 855-824-1000     e-mail: efile@fivelakesagency.com

☐ Check this box if this claim amends a previously filed claim.

Court Claim Number:_____
    *(if known)*

Filed on:_____

Name and address where payment should be sent (if different from above):

Telephone Number:          e-mail:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:**     $148,614.00

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** Money Loaned
   (See instruction #2)

| **3. Last four digits of any number by which creditor identifies debtor:** 1456 | **3a. Debtor may have scheduled account as:**  (See instruction #3a) | **3b. Uniform Claim Identifier (optional):**  (See instruction #3b) |
|---|---|---|

**4. Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:
$0.00

**Nature of property or right of setoff:** ☒ Real Estate ☐ Motor Vehicle ☐ Other
**Describe:** 10155 Toluca Lake Ave Toluca Lake, CA 91602

**Basis for perfection:** _____Mortgage_____

**Value of Property:** $_____

**Amount of Secured Claim:** $148,614.00

**Annual Interest Rate:** 0.00% ☒ Fixed or ☐ Variable (when case was filed)

**Amount Unsecured:** $_____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. 507(a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier - 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

Amount entitled to priority:
$_____

*Amounts are subject to adjustment on 4/01/16 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

B 10 (Official Form 10) (04/13)

10155 Toluca Lake Ave, Toluca Lake, CA 91602

2

**7. Documents**: Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. If the claim is secured by the debtor's principal residence, the Mortgage Proof of Claim Attachment is being filed with this claim (*See instruction #7, and the definition of "redacted".*)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

---

**8. Signature**: (See instructions #8)

Check the appropriate box.

☐ I am the creditor.  ☒ I am the creditor's authorized agent.  ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)  ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: _Yarsheva Colden_
Title: Agents for Creditor
Company: Five Lakes Agency, Inc
Address and telephone number (if different from notice address above): _____   (Signature) _Y Colden_    (Date) _7-16-14_

Telephone number: _____    email: _____

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

---

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*

### Items to be completed in Proof of Claim form

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest and documents required by FRBP 3001(c) for claims based on an open-end or revolving consumer credit agreement or secured by a security interest in the debtor's principal residence. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**8. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

10155 Toluca Lake Ave, Toluca Lake, CA 91602

| DEFINITIONS | | INFORMATION |

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is a person, corporation, or other entity to whom debtor owes a debt that was incurred before the date of the bankruptcy filing. See 11 U.S.C. §101 (10).

**Claim**
A claim is the creditor's right to receive payment for a debt owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien.

A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claims Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the court's PACER system (www.pacer.psc.uscourts.gov) for a small fee to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim.
However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

B 10 (Attachment A) (04/13)

# Mortgage Proof of Claim Attachment

If you file a claim secured by a security interest in the debtor's principal residence, you must use this form as an attachment to your proof of claim. See Bankruptcy Rule 3001(c)(2).

| | | |
|---|---|---|
| **Name of debtor:** Christopher Smith, | **Case number:** | 14-19737 |
| **Name of creditor:** JPMorgan Chase Bank, National Association, successor in interest by purchase from the FDIC as Receiver of Washington Mutual Bank | **Last four digits** of any number you use to identify the debtor's account: | 1456 |

## Part 1: Statement of Principal and Interest Due as of the Petition Date

Itemize the principal and interest due on the claim as of the petition date (included in the Amount of Claim listed in Item 1 on your Proof of Claim form).

1. Principal due                                                    (1) $148,614.00

2. Interest due

| Interest rate | From mm/dd/yyyy | To mm/dd/yyyy | Amount |
|---|---|---|---|
| _____% | __/__/__ | __/__/__ | $_____ |
| _____% | __/__/__ | __/__/__ | $_____ |
| _____% | __/__/__ | __/__/__ + | $_____ |
| Total interest due as of the petition date | | | $_____ Copy total here ▶ (2) + $_____ |

3. Total principal and interest due                                   (3) $148,614.00

## Part 2: Statement of Prepetition Fees, Expenses, and Charges

Itemize the fees, expenses, and charges due on the claim as of the petition date (included in the Amount of Claim listed in Item 1 on the Proof of Claim form).

| Description | Dates incurred | Amount |
|---|---|---|
| 1. Late charges | _____ | (1) $_____ |
| 2. Non-sufficient funds (NSF) fees | _____ | (2) $_____ |
| 3. Attorney's fees | _____ | (3) $_____ |
| 4. Filing fees and court costs | _____ | (4) $_____ |
| 5. Advertisement costs | _____ | (5) $_____ |
| 6. Sheriff/auctioneer fees | _____ | (6) $_____ |
| 7. Title costs | _____ | (7) $_____ |
| 8. Recording fees | _____ | (8) $_____ |
| 9. Appraisal/broker's price opinion fees | _____ | (9) $_____ |
| 10. Property inspection fees | _____ | (10) $_____ |
| 11. Tax advances (non-escrow) | _____ | (11) $_____ |
| 12. Insurance advances (non-escrow) | _____ | (12) $_____ |
| 13. Escrow shortage or deficiency (Do not include amounts that are part of any installment payment listed in Part 3.) | _____ | (13) $_____ |
| 14. Property preservation expenses. Specify: _____ | _____ | (14) $_____ |
| 15. Other. Specify:_____ | _____ | (15) $_____ |
| 16. Other. Specify:_____ | _____ | (16) $_____ |
| 17. Other. Specify:_____ | _____ | (17)+$_____ |
| 18. Total prepetition fees, expenses, and charges. Add all of the amounts listed above. | | (18) $_____ |

10155 Toluca Lake Ave, Toluca Lake, CA 91602

B 10 (Attachment A) (04/13)                                                                                          Page 2

## Part 3: Statement of Amount Necessary to Cure Default as of the Petition Date

Does the installment payment amount include an escrow deposit?

☒ No

☐ Yes. Attach to the Proof of Claim form an escrow account statement prepared as of the petition date in a form consistent with
applicable nonbankruptcy law.

---

1. **Installment payments due**    Date last payment received by creditor        <u>6/1/2014</u>

    Number of installment payments due    (1)    <u>0</u>

2. **Amount of installment payments due**    <u>0</u>  installments @        $ <u>530.76</u>

    _____  installments @        $_____

    _____  installments @        + $_____

    _____

    Total installment payments due as of
    the petition date            $0.00      Copy total here      (2) $0.00

3. **Calculation of cure amount**    <u>Add</u> total prepetition fees, expenses, and charges        Copy total from
    Part 2 here ▶    + $_____

    <u>Subtract</u> total of unapplied funds (funds received but not credited to account)        - $_____

    <u>Subtract</u> amounts for which debtor is entitled to a refund        - $_____

    <u>Total amount necessary to cure default as of the petition date</u>        (3) 0.00

    Copy total onto Item 4
    of Proof of Claim form

10155 Toluca Lake Ave, Toluca Lake, CA 91602

**Washington Mutual**

# WaMu Equity Plus™
## AGREEMENT AND DISCLOSURE

This ___WaMu Equity Plus(TM)___ Agreement and Disclosure ("Agreement") governs your home equity line of credit account (the "Credit Line") issued by the Bank identified below and secured by the property at the address identified below. In this Agreement, we use the words "Borrower," "you" and "your" to mean each and all of the persons who sign this Agreement. The words "we," "us" and "our" mean the Bank or any successor or assign. The word "Card" means each credit card that can be used to obtain advances on the Credit Line, whether in the form of purchase transactions, cash advances or otherwise. A Card will be issued only if so indicated in Section I below. Our "business days" are Mondays through Fridays, but federal legal public holidays are excluded. You should read all of this Agreement, but for your convenience, we have set forth some of the rate, payment and fee information on the first two pages. You and we agree as follows:

## I. GENERAL INFORMATION:

Borrower(s):
CHRISTOPHER R SMITH

| Bank: WASHINGTON MUTUAL BANK | Date of Agreement: 09/21/2007 | Account Number: ▓▓▓456 |
|---|---|---|
| Credit Limit: $150,000.00 | Maturity Date: 09/26/2037 | Initial Draw Period: 120 Months |

Property Address:
10115 TOLUCA LAKE AVE  TOLUCA LAKE, CA 91602-2925

| Effective Disbursement Date: 09/26/2007 The date on and after which you may begin to receive credit advances ("advances") from your Credit Line. This will be a date we specify, which shall follow the expiration of any rescission period required by law, our acceptance of this Agreement, and your meeting of all conditions for the Credit Line. | Card Access: You ☒ will  ☐ will not receive a Card to access your Credit Line. If you will not have Card access, the terms and conditions in this Agreement regarding the Card will not be applicable. |
|---|---|

Discounts: The ANNUAL PERCENTAGE RATE used to calculate the periodic FINANCE CHARGES you pay may be discounted based on your other relationships with the Bank and on whether you authorize payments by our Auto Pay service. The available discounts shown in Table A below are explained further in Section VI 5(c). The specific discount amounts and discounted rates are shown in Tables B and C below.

### Table A - Discounts

| Type of Discount | No. of Accounts Required | Minimum Balance Required | Currently Eligible for Discount |
|---|---|---|---|
| Auto Pay Authorization | 1 | $0.00 | Yes |
| Account Relationships | 1 | $50,000.00 | No |
| First Mortgage Relationship | 1 | $0.00 | Yes |

Payments: Send payments to
WASHINGTON MUTUAL BANK
CONSUMER LENDING – BR2CLFL
PO BOX 6868
LAKE WORTH, FL 33466
or, if a different address is stated in the Periodic Statement, send payments to that address.

## II. VARIABLE RATE ADVANCES:

Variable Rate Index: The Daily Periodic Rate and ANNUAL PERCENTAGE RATE on your Credit Line are subject to change daily based on changes in the "Variable Rate Index," which is the highest "Prime Rate" most recently published in the "Money Rates" table of *The Wall Street Journal*.

Variable Rate Margin:  0.650 % (Does not include any discounts shown in Tables A, B or C)

Maximum Variable Rate: Daily Periodic Rate  0.049315 % (ANNUAL PERCENTAGE RATE 18.000 %)
Minimum Variable Rate: Daily Periodic Rate  0.000000 % (ANNUAL PERCENTAGE RATE 0.000 %)

Minimum Payment: For Variable Rate Advances, your minimum monthly payment ("Minimum Payment") during both the Draw Period and any Post Draw Period (defined in Section VI.4 below) will be equal to all accrued and unpaid FINANCE CHARGES, late fees and other fees and charges described below, plus any past due amounts and any outstanding balance of your Credit Line in excess of your Credit Limit.

Special Promotional Rates: ☐ If this box is checked, then the special Promotional Rates shown in Table B below will apply beginning on the Effective Disbursement Date and continuing until the following Promotional Rate Expiration Date:
_____ N/A

### Table B - Current Rates on Variable Rate Advances

| Number of Discounts | Discount Percentage | Daily Periodic Rate | ANNUAL PERCENTAGE RATE | Daily Periodic Rate (Promotional Rate) | ANNUAL PERCENTAGE RATE (Promotional Rate) |
|---|---|---|---|---|---|
| No Discounts | 0.000 % | 0.023014 % | 8.400 % | N/A % | N/A % |
| 1 Discount | 0.250 % | 0.022329 % | 8.150 % | N/A % | N/A % |
| 2 Discounts | 0.500 % | 0.021644 % | 7.900 % | N/A % | N/A % |

## III. FIXED RATE LOAN OPTION ("FRLO"):

Fixed Rate Loan Option Index and Rates: The FRLO is your option to obtain fixed rate loans ("Fixed Rate Loans") under your Credit Line. Except as otherwise specified below under "Promotional Rates," if you choose to exercise the Fixed Rate Loan Option, the Daily Periodic Rate and ANNUAL PERCENTAGE RATE will be determined based on the "FRLO Index", which is the highest "Prime Rate" most recently published in the "Money Rates" table of *The Wall Street Journal*, plus a "FRLO Margin" of  14.0 %.

Promotional Rates: We may, at our sole discretion and without prior notice, provide a Fixed Rate Loan at a discounted ANNUAL PERCENTAGE RATE, that is, an ANNUAL PERCENTAGE RATE that is lower than the sum of the FRLO Index plus the FRLO

Margin stated above. The Daily Periodic Rate will also be reduced. These are called "Promotional Rates." If we provide Promotional Rates, they will be shown in a confirmation form that we provide you. FRLO Promotional Rates will remain in effect for the term of the FRLO.

### Table C - Current Rates on Fixed Rate Loans

| Number of Discounts | Discount Percentage | Daily Periodic Rate | ANNUAL PERCENTAGE RATE | Daily Periodic Rate (Promotional Rate) | ANNUAL PERCENTAGE RATE (Promotional Rate) |
|---|---|---|---|---|---|
| No Discounts | 0.000 % | 0.049315 % | 18.000 % | 0.023425 % | 8.550 % |
| 1 Discount | 0.250 % | 0.048630 % | 17.750 % | 0.022740 % | 8.300 % |
| 2 Discounts | 0.500 % | 0.047945 % | 17.500 % | 0.022055 % | 8.050 % |

*Rates are examples based on a $50,000 FRLO with an Amortizing Minimum Payment and a Term of five (5) years.

Maximum FRLO Rate:  Daily Periodic Rate ___N/A___ % (ANNUAL PERCENTAGE RATE ___N/A___ %)
Minimum FRLO Rate:  Daily Periodic Rate ___N/A___ % (ANNUAL PERCENTAGE RATE ___N/A___ %)

FRLO Confirmation: ☐ If this box is checked, you have chosen to exercise your option to obtain a Fixed Rate Loan on the Effective Disbursement Date. (If you have chosen to obtain a second Fixed Rate Loan on the Effective Disbursement Date, you must complete a separate form that we will provide to you upon request.) The terms of your Fixed Rate Loan will be as follows:

| Type: | FRLO Sub-Account No.: N/A | Amount: N/A |
|---|---|---|
| Transaction Fee:  There is no Fixed Rate Loan Option Fee for any Fixed Rate Loan obtained upon opening the Credit Line. | Daily Periodic Rate: N/A | Term: N/A Months |
| Buydown Fee (FINANCE CHARGE): ___N/A___ (Equal to ___N/A___ % of the Fixed Rate Loan Amount | ANNUAL PERCENTAGE RATE: N/A | N/A % |

Minimum Payment
N/A

Payment Method:
☐ You have elected to make your Fixed Rate Loan payments by payment coupon or billing statement. If you do not receive your payment coupon or billing statement before your first payment is due, please send your payment, including your FRLO sub-account number (if any), to:
WASHINGTON MUTUAL BANK
CONSUMER LENDING -- BR2CLFL
PO BOX 6868
LAKE WORTH, FL 33466
or you may make your payment at any Washington Mutual Financial Center.

☐ You have elected to make your Fixed Rate Loan payments by our Auto Pay service. You will need to sign a separate Auto Pay Automatic Loan Payment Authorization Form.

How to Get a Fixed Rate Loan After Closing:  Call 1-888-800-8738 toll-free (for TDD, call 800-735-2922) or, if a different telephone number is stated in the Periodic Statement, call that telephone number.

### Table D - Fixed Rate Loan Terms

| Type of Minimum Payment | Fixed Rate Loan Dollar Amount | Maximum Permissible Term |
|---|---|---|
| Amortizing Minimum Payment | Up to $19,999.99 | Up to 120 months (10 years). If the Term extends beyond the Maturity Date, the principal amount will not fully amortize, and the remaining principal will be due and payable in full on the Maturity Date. |
| Amortizing Minimum Payment | $20,000.00 or more | Up to 240 months ( 20 years). If the Term extends beyond the Maturity Date, the principal amount will not fully amortize, and the remaining principal will be due and payable in full on the Maturity Date. |
| Interest-Only Minimum Payment | Any amount | 3, 5, 7 or 10 years, but the term must conclude before the Maturity Date |

## IV. FEES AND CHARGES:

FINANCE CHARGES and Other Fees and Charges at Closing:  You agree to pay the following FINANCE CHARGES and other fees and charges, which will be charged to your Credit Line on the Effective Disbursement Date unless paid to us on or before that date. Periodic FINANCE CHARGES will begin to accrue immediately on these amounts if charged to your Credit Line.

FINANCE CHARGES:                                    Other Fees and Charges:

* These items will be paid by the Bank and charged to your Credit Line

Additional FINANCE CHARGES:  You agree to pay the following additional FINANCE CHARGES:

Cash Advance Fee.  A cash advance fee FINANCE CHARGE of 2.00% of each cash advance obtained on the Card, or $2.00, whichever is greater.

Fee for Small Variable Rate Advance.  If, at our sole option, we elect to honor a request for a Variable Rate  Advance of less than $100.00, a transaction FINANCE CHARGE of 4.00% of the amount of the advance.  This FINANCE CHARGE will not be imposed for Card transactions.

Fee for Lien Subordination.  If, at our sole option, we agree to subordinate the lien of the Security Instrument, a transaction FINANCE CHARGE of  $50.00 - $250.00  .

**Wire Transfer Fee.** A wire transfer FINANCE CHARGE of _$30.00_ for each advance that you initiate by a wire transfer.

**Courier Service Fee.** A courier service FINANCE CHARGE of _$30.00_ for each transmittal of documents that you request which we send by a delivery service.

**Fixed Rate Loan Option Fee.** A transaction fee FINANCE CHARGE of _$50.00_ for each Fixed Rate Loan that you receive. The Fixed Rate Loan Option Fee will be waived for any Fixed Rate Loan received on the Effective Disbursement Date or for the first Fixed Rate Loan received subsequently.

**Buydown Fee.** If we offer you the option to pay a fee in exchange for a reduced ANNUAL PERCENTAGE RATE for a Fixed Rate Loan, a transaction fee FINANCE CHARGE of 4.000% of the amount of the Fixed Rate Loan will be charged in return for a reduction of 0.250% in the ANNUAL PERCENTAGE RATE of the Fixed Rate Loan. At our sole discretion, we reserve the right to charge you a lesser Buydown Fee and/or offer a greater reduction in the ANNUAL PERCENTAGE RATE at the time you obtain a Fixed Rate Loan.

**Additional Other Fees and Charges:** You agree to pay the following additional other fees and charges:

**Annual Fee.** An annual fee of _$0.00_ ("Annual Fee"). The Annual Fee will be charged on the first anniversary of the Effective Disbursement Date and on every anniversary thereafter during the Draw Period. The Annual Fee is nonrefundable and will be imposed regardless of the balance and status of the Credit Line.

**Late Fee and Collection Charges.** In addition to our other rights upon default, if we do not receive the Minimum Payment on the Variable Rate Advances or any Fixed Rate Loans within _____fifteen (15)_____ days after the Payment Due Date shown on your Periodic Statement (or, if applicable, on any payment coupon that we provide you), you will be charged a late fee of the greater of _$15.00_ or _5.000_% of the Minimum Payment. Upon your default under this Agreement, you will pay all of our reasonable costs and collection charges, whether or not there is a lawsuit, including, without limit, attorneys' fees and legal expenses, including without limit, for bankruptcy or civil proceedings, our efforts to modify or vacate an automatic stay or injunction, appeals, and any anticipated post-judgment collection services, and whether or not such are incurred by our employees or third parties.

**Overlimit Fee.** An overlimit fee of _$20.00_ for each advance from the Credit Line that causes you to exceed your Credit Limit.

**Dishonored Payment Fee.** A fee of _$20.00_ if you make a payment on your Credit Line (including any payment on a Fixed Rate Loan) with a check, draft, or other item or transfer (including an Auto Pay service transfer) that is dishonored for any reason.

**Stop Payment Fee.** A fee of $20.00 when you request a stop payment on a Check (as defined in Section VI.6(a) below.) A stop payment shall be effective for six (6) months (or, if applicable, such longer period as provided by law) and must be delivered to us in the manner prescribed by law or by method acceptable to us in our sole discretion and in sufficient time for us to act. If a stop payment notice expires, you must renew it as set forth above and you will be assessed an additional stop payment fee. There is no right to stop payment on transactions by use of a Card or other means of access other than a Check.

**Cancellation Fee.**
If you cancel your Credit Line during the first '36' months (30 months in NC) following the Effective Disbursement Date, you will be charged a cancellation fee equal to .125% of the Credit Limit or $500.00, whichever is greater.

**Foreign Currency Transactions.** If you use the Card to make a purchase or obtain an advance in a foreign currency (the "transaction currency"), it will be converted by Visa International or MasterCard International (depending on which Card we issue from time to time) into U.S. Dollars (the "billing currency"). The details for conversion are discussed below in Section VI.6. We do not determine the exchange rate that is used and we do not add or subtract any adjustment to the exchange rate.

**Reject Fee.** A reject fee of _$20.00_ if a Check or other advance request (other than for a Card transaction) is not honored for any reason.

**Copy and Research Fees.** A copy fee of _$1.00_ per item and research fees of _$10.00_ per hour will be assessed if you request copies of Checks or other research relating to your Credit Line.

**Release Fee.** A fee of _$65.00_ in connection with the release, discharge or reconveyance of the Security Instrument (as defined in Section VI.3 below).

**Other Institution Fees.** Fees imposed by other institutions if you use the Card to obtain cash advances through their ATMs.

## V. STATE-SPECIFIC NOTICES:

For the State of: CALIFORNIA

**Due on Transfer.** The Security Instrument (as defined in Section VI.3 below) contains the following provisions relating to certain sales and transfers of the Property:
Subject to applicable law, the entire Debt shall become immediately due and payable in full upon sale or other transfer of the Property or any interest therein by Trustor by contract of sale or otherwise including, without limit, any further encumbrance of the Property.

**Governing Law.** This Agreement and your Credit Line will be governed by and interpreted in accordance with the laws of the United States of America and, to the extent that such laws are not applicable, with the internal laws of the State of _____Nevada_____ (without giving effect to any choice of law rule that would cause the application of the laws of any other jurisdiction to the rights and duties of the parties). Interest shall be charged at rates allowed to any class of lender by the laws of the State of _____Nevada_____.

## VI. STANDARD TERMS AND CONDITIONS:

**1. Promise to Pay.** You promise to pay to us, or our order, all advances from the Credit Line plus all FINANCE CHARGES, fees, charges, expenses and other amounts required by the terms of this Agreement. All amounts outstanding under the Credit Line that are covered by the Fixed Rate Loan Option described in Section VII below are sometimes referred to in this Agreement as "Fixed Rate Loans." All other amounts outstanding under the Credit Line are sometimes referred to in this Agreement as "Variable Rate Advances." Unless otherwise provided in this Agreement, any amounts charged to the Credit Line shall be treated as Variable Rate Advances. If there is more than one of you, each is jointly and severally liable under this Agreement. Each Borrower alone may request the Credit Line, receive advances from the Credit Line and, except as stated below, take all actions with respect to the Credit Line. If Section I above indicates that you will receive a Card to access your Credit Line, each of you requests that we issue each Borrower a Card.

Your use of the Card at Automated Teller Machines ("ATMs") is subject to our rules relating to ATM transactions.

**2. Credit Limit.** This Agreement covers a revolving line of credit in the amount shown in Section I above (the "Credit Limit"). During the Draw Period described below, you may obtain advances from the Credit Line up to the Credit Limit, repay any portion of the amounts advanced and obtain additional advances up to the Credit Limit. If there is more than one of you, each of you alone has the right to borrow up to the full amount of the Credit Limit and each of you is liable for all advances made to any of you. You agree not to request or obtain an advance that will make the Credit Line balance exceed the Credit Limit. We may, at our option, make advances in excess of the Credit Limit. At our request, you will immediately repay the amount by which the balance of the Credit Line exceeds the Credit Limit.

**3. Security Instrument.** To secure the performance of your obligations under this Agreement, one or more of you is giving us a deed of trust, deed to secure debt, mortgage or other security agreement (the "Security Instrument") on the real property located at the address specified in Section I above and other property described therein (the "Property"). If the title to the Property is held by a trust, references in this Agreement to "you" and "your" shall include, with respect to the Property and as applicable, a person who is signing the Security Instrument as a trustee of the trust. The Security Instrument secures all advances and other amounts owed under this Agreement as well as after-acquired property located on or attached to the Property. You agree to perform all of your obligations under the Security Instrument. Regardless of the terms of any other security instrument that you have with us, no personal or real property, other than the Property, secures your obligations under this Agreement.

You will perform on a timely basis all payment and other obligations under the terms of any other deed of trust, mortgage, deed to secure debt or other security agreements or leases on the Property, as well as under any note or other obligation the performance of which is secured by the same.

**4. Draw Period and Post Draw Period; Payments.** You may obtain advances from the Credit Line for the number of years after the Effective Disbursement Date described in Section I above (the "Draw Period"). At our option, we may extend the Draw Period for up to two (2) additional periods that are each no longer than the initial Draw Period stated in Section I above. The period of time, if any, between the end of the Draw Period and the Maturity Date is the "Post Draw Period." If the Draw Period is for ten (10) years, the Post Draw Period is for twenty (20) years. If the Draw Period is for twenty (20) years, the Post Draw Period will be ten (10) years. For example if the Draw Period is for thirty (30) years, there will not be a Post Draw Period. During the Post Draw Period, if any, you will no longer be able to obtain advances from the Credit Line.

Payments for both Variable Rate Advances and any Fixed Rate Loans are due monthly. The payment due date (the "Payment Due Date") may be different for Variable Rate Advances and Fixed Rate Loans, and each Fixed Rate Loan may have its own Payment Due Date. At our sole option, we may change the Payment Due Dates at any time, and we may establish one Payment Due Date each month for all payments due with respect to the Variable Rate Advances and each Fixed Rate Loan. The Payment Due Date will be stated in your periodic billing statement (the "Periodic Statement") or, if applicable, on any payment coupons that we provide you.

For Variable Rate Advances, your minimum monthly payment ("Minimum Payment") during both the Draw Period and any Post Draw Period will be equal to the amount specified in Section II above as the Minimum Payment. Paying the Minimum Payments will not repay the principal that is outstanding on the Credit Line. You will be required to pay the entire outstanding balance of the Variable Rate Advances (together with all accrued and unpaid FINANCE CHARGES relating to the Variable Rate Advances and all other related amounts that you owe under this Agreement) in a single

payment on the Maturity Date. We are not obligated to refinance any amount due on the Maturity Date. Your payments for any Fixed Rate Loans are described in Section VII below. For both Variable Rate Advances and Fixed Rate Loans, the following shall apply to payments. Payments must be made in U.S. Dollars. When you pay by check, funds must be drawn on a U.S. office of the financial institution. All payments shall be mailed, postage prepaid, to the address that appears on your Periodic Statement (or, if applicable, on any payment coupons that we provide you) for receipt of payments. Any payments that are not received on a business day, or that are received after 5:00 p.m. (prevailing Pacific Time) on a business day, will be treated as having been received on the next following business day. We can accept and apply any late or partial payments, or payments marked "Payment in Full" or similar statement, or with a request to apply a payment in a particular manner, to amounts you owe as set forth in this Agreement without liability on our part and without losing any of our rights under this Agreement. You will not make payments from funds obtained from the Credit Line or any other line of credit from the Bank or any of its affiliates. Payments accepted by the Bank on your Credit Line may be subject to temporary holds on the availability of funds before the payment amount may be re-advanced.

Each month, you will be required to send us one payment for the Variable Rate Advances and an additional separate payment for each Fixed Rate Loan. At our sole option, we may change this process at any time and require you to send us a single payment for both the Variable Rate Advances and your Fixed Rate Loan(s). Each payment will first be applied to accrued and unpaid periodic FINANCE CHARGES, then to any principal due, then to other FINANCE CHARGES, then to other fees and charges, and then to the unpaid principal balance. If you make a payment but do not specify where it should be applied, we will apply the payment in our discretion to outstanding Fixed Rate Loan(s) and/or Variable Rate Advances.

**5. Periodic FINANCE CHARGE; Daily Periodic Rate; ANNUAL PERCENTAGE RATE.** The date on which periodic FINANCE CHARGES begin to accrue will depend upon the type of advance you obtain from the Credit Line. Periodic FINANCE CHARGES will begin to accrue from the date that we initiate a wire transfer, the date that you request to advance from one of our Financial Centers, the effective date of a Card transaction, the effective date of your withdrawal of funds from an ATM, the date that a Check (as defined below) is processed by us, the date of any increase to the balance of the Variable Rate Advances in accordance with Section VI.11(c) or Section VII.3(b), or Section VII.4 below, the date that we prepare a check to fund a Fixed Rate Loan on the Effective Disbursement Date or, thereafter, on the effective date of the conversion of all or any portion of the Variable Rate Advances and/or one or more existing Fixed Rate Loans into a new Fixed Rate Loan and, for any other types of advances, the date the advance is made. Periodic FINANCE CHARGES will continue to accrue until all amounts subject to the periodic FINANCE CHARGES are paid in full. There is no free ride period that would allow you to avoid paying a periodic FINANCE CHARGE on advances you obtain from the Credit Line.

During both the Draw Period and any Post Draw Period, the periodic FINANCE CHARGE on the Variable Rate Advances for each billing period is a function of the Daily Periodic Rate (as described below), the Average Daily Balance (as described below), and the number of days in the billing period, as follows:

(a) The Daily Balance of your Variable Rate Advances for each day of the billing period will be all Variable Rate Advances due at the beginning of that day, plus all new Variable Rate Advances (including, without limitation, any increase to the balance of the Variable Rate Advances in accordance with Section VI.11(c) or Section VII.3(b), or Section VII.4 below), less all payments and credits relating to Variable Rate Advances received that day. Nothing in this Section VI.5 authorizes you to obtain advances from the Credit Line during the Post Draw Period.

(b) The Average Daily Balance is the sum of the Daily Balances of all days in the billing period divided by the number of days in the billing period.

(c) The ANNUAL PERCENTAGE RATE and Daily Periodic Rate may vary. Except as stated below, the ANNUAL PERCENTAGE RATE will be equal to the sum of the Variable Rate Index stated in Section II above plus the Variable Rate Margin stated in Section II above, and the Daily Periodic Rate will be equal to the ANNUAL PERCENTAGE RATE divided by 365 (366 in a leap year). The ANNUAL PERCENTAGE RATE will be reduced by the amount of any applicable discounts shown in Table B in Section II above. The total discount will be based on the number of discounts that are applicable depending on whether you qualify for a particular discount at the time the ANNUAL PERCENTAGE RATE is determined. You will be eligible for a discount for "Auto Pay" if you authorize automatic loan payments for Variable Rate Advances using our Auto Pay service from an account at the Bank that you designate. If you qualified for an Auto Pay discount, you will no longer qualify if you or we cancel the Auto Pay or if you change to an automatic debit arrangement involving an account at another financial institution. You may separately decide whether you wish to authorize Auto Pay for the Variable Rate Advances and for each Fixed Rate Loan. Your

decision whether or not to authorize our Auto Pay service will not affect the availability of the Variable Rate Advances or Fixed Rate Loans. You will be eligible for a discount for "Account Relationships" as indicated in Table A if you maintain at least the specified number of accounts and the dollar amount of deposit, credit and investment accounts with the Bank, or its affiliate, as defined by the Bank. If you qualified for an "Account Relationships" discount, you will no longer qualify if the combined balances of the accounts fall below the minimum required. Further, an account will no longer be considered for the combined balance calculation if it becomes 30 or more days past due, is closed, or if no Borrower continues to be on title for the account. You will be eligible for a discount for a "First Mortgage Relationship" as indicated in Table A if you have outstanding the specified loan account and balance with the Bank, as defined by the Bank. If you qualified for a "First Mortgage Relationship" discount, you will no longer qualify if the loan used to obtain the discount becomes 30 or more days past due, is paid off or otherwise closed, or if no Borrower continues to be a borrower of record for the loan. Any discount marked "Not Applicable" or with similar language in Table A will not be available to you. If you do not qualify for a discount initially, but subsequently do so, the discount (up to the maximum number and amount of discount stated in Table B above) will be put into effect as of a date that we select.

Except as otherwise provided in this Section VI.5(c), the **ANNUAL PERCENTAGE RATE** and Daily Periodic Rate will change, beginning on the day following the Effective Disbursement Date, on each day that the Variable Rate Index changes. The Daily Periodic Rate and corresponding **ANNUAL PERCENTAGE RATE** for Variable Rate Advances will never be more than the maximum rates, and will never be less than the minimum rates, shown in Section II above. Increases in the Daily Periodic Rate and **ANNUAL PERCENTAGE RATE** will increase your Minimum Payment, periodic **FINANCE CHARGES**, and your final payment due on the Maturity Date.

(d) If Section II above indicates that special promotional rates will apply, then the initial Daily Periodic Rate and corresponding **ANNUAL PERCENTAGE RATE** will be lower than the sum of the Variable Rate Index plus the Variable Rate Margin. These lower rates are called "Promotional Rates." The Daily Periodic Rate will be equal to the **ANNUAL PERCENTAGE RATE** divided by 365 (366 in a leap year). If you are provided with Promotional Rates, the **ANNUAL PERCENTAGE RATE** will be reduced by the amount of any applicable discount shown in Table B in Section II above. The total discount will be based on the number of discounts that are applicable depending on whether you qualify for a particular discount at the time the **ANNUAL PERCENTAGE RATE** is determined. A description of these discounts is found in Section VI.5(c). If you do not qualify for a discount initially, but subsequently do so, the discount (up to the maximum discount stated in Table B above) will be put into effect as of a date that we select. If you are provided with Promotional Rates, the Promotional Rates will remain in effect until the Promotional Rate Expiration Date stated in Section II above, on which date the higher Daily Periodic Rate and corresponding **ANNUAL PERCENTAGE RATE** determined in accordance with Section VI.5(c), (f) will apply.

(e) The current Daily Periodic Rates and corresponding **ANNUAL PERCENTAGE RATES** are specified in Table B in Section II above. These rates will depend on (i) whether you have qualified for one or more discounts, (ii) whether you are being provided with Promotional Rates, or (iii) whether you have both qualified for one or more discounts and are being provided with Promotional Rates.

(f) If you have qualified for one or more discounts in the **ANNUAL PERCENTAGE RATE** (including any Promotional Rate), but thereafter you no longer qualify, the discount(s) will be eliminated on the date that you fail to qualify. On that date, the **ANNUAL PERCENTAGE RATE** will increase by the amount of the discount(s) for which you no longer qualify, and the Daily Periodic Rate will increase to the new **ANNUAL PERCENTAGE RATE** divided by 365 (366 in a leap year). For example, if you initially qualified for two discounts, but later qualify for only one discount, the increase in the **ANNUAL PERCENTAGE RATE** will equal the amount by which "2 discounts" exceeds "1 discount" in Table B. However, the increased Daily Periodic Rate and **ANNUAL PERCENTAGE RATE** will not be greater than the maximum rates stated in Section II above. Increases in the Daily Periodic Rate and **ANNUAL PERCENTAGE RATE** will increase your Minimum Payment, periodic **FINANCE CHARGES**, and your final payment due on the Maturity Date.

(g) The "Variable Rate Index" is stated in Section II above. If the Variable Rate Index, or any substitute Variable Rate Index, is no longer available, we will choose a new Variable Rate Index. The new Variable Rate Index will have a historical movement substantially similar to that of the prior Variable Rate Index, and the Variable Rate Margin will be changed so that the new Variable Rate Index plus the Variable Rate Margin will result in an **ANNUAL PERCENTAGE RATE** that is substantially similar to the **ANNUAL PERCENTAGE RATE** in effect at the time the prior Variable Rate Index becomes unavailable (plus any increase in the **ANNUAL PERCENTAGE RATE** that results from any termination of any Promotional Rate and/or the discounts, as described in Section VI.5(d), (f)).

(h) The Daily Periodic Rate may change within a single billing period. If only one Daily Periodic Rate is in effect during

the billing period, the periodic **FINANCE CHARGE** for the billing period will be calculated by first multiplying the Average Daily Balance by the applicable Daily Periodic Rate, and then multiplying that amount by the number of days in the billing period. If more than one Daily Periodic Rate is in effect during a billing period, the periodic **FINANCE CHARGE** for the billing period will be calculated by: (i) calculating a periodic **FINANCE CHARGE** for each Daily Periodic Rate by first multiplying that Daily Periodic Rate by the Average Daily Balance, and by then multiplying that amount by the number of days that such Daily Periodic Rate is in effect during the billing period, and (ii) by then adding together the periodic **FINANCE CHARGES** that are so determined for each such Daily Periodic Rate.

The **ANNUAL PERCENTAGE RATE** for both the Variable Rate Advances and the Fixed Rate Loans do not include costs other than interest. The periodic **FINANCE CHARGE** and **ANNUAL PERCENTAGE RATE** for the Fixed Rate Loans are described in Section VII below.

**6. Variable Rate Advances.** Provided you are not in default and your right to obtain advances has not been terminated, suspended or cancelled, you may obtain Variable Rate Advances during the Draw Period and on and after the Effective Disbursement Date. All advances, other than by Card transactions outside the United States (as described below), shall be in U.S. Currency. You may obtain Variable Rate Advances as follows:

(a) Writing a preprinted check ("Check") that we supply to you for use with your Credit Line. The signature of only one Borrower is required for each Check.

(b) Using the Card to effect purchases, obtain cash advances at authorized ATMs (using the separate Personal Identification Number ("PIN") that we will supply to each of you), obtain cash advances at other locations or otherwise obtain advances.

(c) Requesting an advance in person at any of our Financial Centers. You will need to provide acceptable identification to obtain an advance.

(d) A wire transfer of funds to an account that you designate. Wire transfers are subject to our rules governing wire transfer transactions.

You authorize us to make available additional means of obtaining advances. Those advances will also be subject to this Agreement.

In addition, the balance of the Variable Rate Advances may be increased in accordance with Section VI.11(c) or Section VII.3(b), or Section VII.4(c) below.

If you use the Card to make a purchase or obtain an advance in a foreign currency (the "transaction currency"), it will be converted by Visa International or MasterCard International (depending on which Card we issue from time to time) into U.S. Dollars (the "billing currency"). Visa International or MasterCard International, as applicable, will use the procedures set forth in its operating regulations or conversion procedures in effect at the time the transaction is processed. Currently, the Visa International operating regulations state that the exchange rate between the transaction currency and the billing currency is: (i) a rate selected by Visa from the range of rates available in wholesale currency markets for the applicable central processing date, which rate may vary from the rate Visa itself receives or (ii) the government-mandated rate in effect for the applicable central processing date, in each instance, plus or minus an adjustment determined by the card issuer. The exchange rate for the applicable central processing date may differ from the rate in effect on the transaction date or the posting date. Currently, the MasterCard International conversion procedures state that the exchange rate between the transaction currency and the billing currency is either a wholesale market rate or a government-mandated rate as of a date selected by MasterCard International, in each instance plus or minus an adjustment determined by the card issuer. The exchange rate used by MasterCard International may differ from the rate in effect on the transaction date or the posting date. Regardless of which Card is used, the exchange rate used may be the same as, greater than, or less than the rate that would be available through a financial institution in the country in which the purchase or advance occurred. We do not determine the exchange rate that is used and we do not add or subtract any adjustment to the exchange rate.

**7. Minimum Advances and Other Limitations.** Each Variable Rate Advance, other than a purchase transaction with a Card, must be not less than $100.00. We may, at our option, make Variable Rate Advances of less than $100.00. At our option, we may (but reserve the right not to) honor any requests for advances in the following circumstances:

(a) Your credit privileges have been cancelled, suspended or terminated.

(b) Your Credit Limit is currently exceeded or would be exceeded if we honored the advance request.

(c) Your Check is post-dated (written and presented before the date on the item) or stale dated (presented more than six (6) months after the date of the item).

(d) Your Check bears a restriction or notation.

(e) Your Checks have been reported lost or stolen or, if advances requiring a PIN have been authorized, you have reported that your PIN has been compromised.

(f)  You are in material default of this Agreement or would be so if we honored the advance request.

(g)  We receive conflicting instructions or demands from any of you.

(h)  You have asked us to prepare a payoff demand statement setting forth the amounts required to satisfy your obligations under this Agreement.

You agree to hold us harmless and indemnify us against any claim or loss the payee or any other endorser or depositing or collecting bank may assert regarding such restrictions, notations or post or stale dated items. You further agree to indemnify and hold us harmless for any claim or loss relating to honoring or refusing to honor any instructions or demands which we believe may be conflicting.

Our liability, if any, for wrongful dishonor of an advance request is limited to your actual damages, shall not include consequential damages and in no event will exceed the amount of the advance request.

Checks may be processed mechanically based on information encoded on the item. Checks not meeting our format and encoding specifications may not be honored. The signature on each Check should match the signature on file with us, however, we may not verify the signature if the item is processed mechanically. Subject to applicable law, we will only pay Checks that are presented to us by another financial institution. We do not "certify" Checks drawn on your Credit Line.

**8. Illegal Transactions.** You will not use any advance, the Card, a Check or other access device to engage in any Internet gambling or illegal transaction (including, without limitation, illegal gambling). We are not responsible for preventing you from doing so.

**9. Periodic Statement.** As required by law, we will send you a Periodic Statement showing all new transactions since the prior Periodic Statement closing date and other information relating to the Credit Line. The Periodic Statements may be sent on other than a calendar month basis. We reserve the right to change the Periodic Statement closing date. We may choose not to return Checks along with your Periodic Statement.

**10. Loss or Theft.** Notify us if any unauthorized use of your Credit Line has occurred or may occur as a result of loss or theft of one or more of your Checks, Cards or other access device or if you believe someone else knows your PIN. The best way to notify us is by calling us. Call us at  800-556-5678  (for TDD, call 800-735-2922) or, if a different telephone number is stated in the Periodic Statement, call that number. You may also write us at the address stated in Section VI.16 below. You agree to reasonably assist us in determining the facts and circumstances relating to any unauthorized use of your Credit Line.

**11. Termination and Acceleration; Suspension of Advances and Reduction of Credit Limit; Other Remedies.**

(a)  We may terminate your Credit Line and require you to pay us the entire outstanding balance of the Credit Line (including the outstanding balance of any Fixed Rate Loans), together with all other fees, charges and amounts owing under this Agreement or the Security Instrument, in one payment, if any of the following happen:

(i)  You commit fraud or make a material misrepresentation at any time in connection with the Credit Line. This can include, for example, a false statement about your income, assets, liabilities or any other aspect of your financial condition.

(ii)  You do not meet any of the repayment terms of this Agreement.

(iii)  Your action or inaction adversely affects the Property or our rights in the Property. This can include, for example, failure to maintain required insurance or pay taxes on the Property, waste or destructive use of the Property which impairs our security, death of the last Borrower, death of all but one Borrower which impairs our security, transfer of title or sale of the Property without our permission, permitting the creation of a senior lien on the Property, foreclosure by the holder of a prior lien on the Property or use of the Property for an illegal purpose that subjects the Property to seizure.

If we terminate the Credit Line, no additional advances will be made and the entire outstanding balance of the Credit Line (including the outstanding balance of any Fixed Rate Loans) will be immediately due and payable without prior notice, except as may be required by law, and you agree to pay immediately such amount plus any other amounts due under this Agreement.

Failure to meet the repayment terms of any portion of the Credit Line, such as for Fixed Rate Loans or for Variable Rate Advances, will be considered failure to meet the repayment terms of the entire Credit Line, and this will give us the right to demand the immediate repayment of the entire outstanding balance of the Credit Line and to exercise any of our other rights under this Agreement. Likewise, payment of only a portion of the amount required under the repayment terms of this Agreement will not satisfy your repayment obligations for

the entire Agreement. If a partial payment is made, we reserve the right to accept the payment and apply it to the outstanding balance of the Credit Line in accordance with Section VI.4 without waiving our right to demand immediate payment of the entire outstanding balance of the Credit Line or to exercise any of our other rights under this Agreement.

(b)  In addition to any other rights we may have, we can suspend additional advances (including any Fixed Rate Loans) or reduce your Credit Limit during any period in which any of the following are in effect:

(i)  The value of the Property declines significantly below the value as determined by us at the time you applied for your Credit Line. This includes, for example, a decline such that the difference between the Credit Limit and the available equity is reduced by fifty percent (50.00%) and may include a smaller decline depending on individual circumstances.

(ii)  We reasonably believe that you will be unable to fulfill your payment obligations under this Agreement due to a material adverse change in your financial circumstances.

(iii)  You are in default of a material obligation of this Agreement. We consider all of your obligations to be material. Categories of material obligations include, for example, the events described above permitting us to terminate, obligations and limitations relating to your receipt of advances, obligations concerning maintenance or use of the Property, obligations to perform the terms of the Security Instrument or any other deed of trust, mortgage, deed to secure debt or other security agreement or lease on the Property (and to perform on any notes or other obligations secured by the same), obligations to notify us and to provide documents and information to us (such as updated financial information), and obligations to comply with applicable law (such as zoning restrictions).

(iv) We are precluded by government action from imposing the **ANNUAL PERCENTAGE RATE** provided for under this Agreement.

(v)  The priority of our security interest in the Property is adversely affected by government action to the extent that the value of the security interest is less than 120.00% of the Credit Limit.

(vi) We have been notified by a government authority that continued advances may constitute an unsafe and unsound business practice.

(vii) If the maximum **ANNUAL PERCENTAGE RATE** stated in Section II above has been reached.

Regardless of any action that we take, all other terms of this Agreement will remain in effect and be binding upon you.

(c)  If, at any time, we have the right to terminate your Credit Line under Section VI.11(a) above, we may, at our sole option and without prior notice to you, then or thereafter convert any or all of your Fixed Rate Loans (including both the unpaid principal balance of the Fixed Rate Loans plus all accrued and unpaid FINANCE CHARGES) to the balance of your Variable Rate Advances, which will then accrue **FINANCE CHARGES** in accordance with Section VI.5 above and be subject to all other provisions of this Agreement relating to Variable Rate Advances. No exercise of this right to convert and nothing in this Section VI.11(c) shall constitute an election of remedies or a waiver of any of our rights under the remaining provisions of this Agreement, the Security Instrument or at law or in equity.

(d)  Any Borrower may cancel the Credit Line or suspend the right to obtain advances by sending a written notice of cancellation or suspension to the address stated in Section VI.16 below. The notice must identify the account number of the Credit Line and be signed by at least one Borrower. The notice will be effective when it has been received and accepted by us. If the right to obtain advances is suspended at the request of a Borrower, advances will be reinstated only following our receipt and approval of a written request for reinstatement that has been signed by each of you.

(e)  If the Credit Line is cancelled, suspended or terminated, you agree not to attempt to write or deliver any Checks, use a Card or any other access device or otherwise obtain advances. You will return all Cards and unused Checks to us. You remain liable for any use of Checks, Cards or other access devices and any advances taken even after any cancellation by you or us, termination or suspension. If your Credit Line is cancelled or terminated, subject to applicable law, we may delay the cancellation or release of the Security Instrument for a reasonable period of time to enable us to post to your Credit Line any advances that you have received.

Our rights under this Agreement shall be in addition to any other rights we may have under the Security Instrument or at law or in equity.

**12. Delay in Enforcement; Corrections.** To the extent permitted by law, we may delay or waive the enforcement of any of our rights under this Agreement without losing that right or any other right and if we delay or waive any of our rights, we may enforce that right at any time in the future without advance notice. We may correct any inaccuracies that we find with respect to the Credit Line or any Periodic Statements.

**13. Presentment.** You waive any statutes of limitations, and any legal requirements of presentment, demand, protest, notice of dishonor and notice of protest of this Agreement.

1456

**14. Credit Information.** You will provide us with a current financial statement, a new credit application, or both, at any time upon our request. We may obtain credit reports on you at any time for the purpose of reviewing or collecting your Credit Line. You authorize us to release information to others (such as credit bureaus, merchants, other financial institutions and any of our affiliate companies) about our transactions or experiences with you. **WE MAY REPORT INFORMATION ABOUT YOUR ACCOUNT TO CREDIT BUREAUS. LATE PAYMENTS, MISSED PAYMENTS, OR OTHER DEFAULTS ON YOUR ACCOUNT MAY BE REFLECTED IN YOUR CREDIT REPORT.**

**15. Transfer and Assignment.** Without prior notice to or approval from you, we reserve the right to sell or transfer this Agreement, the Credit Line and our obligations under this Agreement to any other person. Your rights under this Agreement belong to you only and may not be transferred, assumed or assigned. Your obligations, however, are binding upon your heirs and legal representatives.

**16. Notices.** Except as otherwise provided in this Agreement, notices must be in writing. Notice to any of you shall be deemed notice to all of you. Notices shall be deemed given when deposited in the U.S. Mail, postage prepaid first class mail, or when delivered in person, or sent by registered or certified mail, or by nationally recognized overnight courier. Notice to you shall be sent to your last known address in our records for the Credit Line. Notice to us must be sent to:
WASHINGTON MUTUAL BANK
CONSUMER LENDING -- BR2CLFL
PO BOX 6868
LAKE WORTH, FL 33466
or, if a different address is stated in the Periodic Statement, to that address. Any party may change its address for receipt of notices by giving notice of the same, as set forth herein, to the other parties. You agree to notify us immediately if you change your name, address or employment or if any of you dies, is declared incompetent or is the subject of a bankruptcy or insolvency proceeding.

**17. Tax Consequences.** You should consult your own tax advisor regarding the tax deductibility of interest and charges under this Agreement.

**18. Special Terms.** In our sole discretion, we may offer you special terms on Variable Rate Advances from time to time. The special terms may include, by way of example, reduced rates, reduced fees, and reduced payments. The special terms may be available for temporary periods of time and on a limited basis.

**19. Amendment.** In addition to other changes described in this Agreement, we may make changes to the terms of this Agreement if you agree to the change in writing at that time, if the change will unequivocally benefit you throughout the remainder of your Credit Line or if the change is insignificant.

**20. Interpretation.** The names given to sections or paragraphs in this Agreement are for convenience and shall not be used to interpret this Agreement. This Agreement, the Periodic Statements and, if applicable, any payment coupons that we provide you are the best evidence of your agreement with us. If any provision of this Agreement, the Periodic Statements or any such payment coupons is found not to be valid or enforceable, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of such provision or the remaining provisions of that document, which provisions shall continue to be binding, valid and enforceable.

## VII. FIXED RATE LOAN OPTION

**1. Introduction.** If indicated in Section III above, you have the option (the "Fixed Rate Loan Option") to obtain advances from your Credit Line in the form of Fixed Rate Loans as described in this Section. Except as stated below, the Fixed Rate Loans will be subject to a fixed Daily Periodic Rate and ANNUAL PERCENTAGE RATE and a fixed term.

**2. General Terms and Conditions for the Fixed Rate Loan Option.** The following shall apply to the Fixed Rate Loan Option:
 (a) The Fixed Rate Loan Option may be exercised only during the Draw Period.
 (b) You may exercise the Fixed Rate Loan Option to obtain up to two (2) Fixed Rate Loans on the Effective Disbursement Date which, in the aggregate, may be any amount up to the then available portion of the Credit Limit. Thereafter, you may only exercise the Fixed Rate Loan Option by converting all or any portion of (i) the outstanding Variable Rate Advances, and/or (ii) one (1) or more existing Fixed Rate Loans, into a new Fixed Rate Loan in accordance with our procedures. Following the Effective Disbursement Date, you may not obtain a Fixed Rate Loan by obtaining an advance of new funds from the Credit Line.
 (c) Each Fixed Rate Loan may be for any amount, but the aggregate of all Fixed Rate Loans and outstanding Variable Rate Advances must not exceed your available Credit Limit.
 (d) The portion of the Credit Limit that is available to you for Variable Rate Advances will be reduced by the amount of each Fixed Rate Loan. Any repayment of the principal amount

of a Fixed Rate Loan during the Draw Period will restore the available Credit Limit by an equal amount.
 (e) You may exercise a Fixed Rate Loan Option only if no defaults exist under the terms of this Agreement or the Security Instrument, your right to obtain advances has not been terminated, suspended or cancelled and you sign all documents required by us. You may not obtain more than two (2) Fixed Rate Loans in any one (1) calendar year period and may not have more than five (5) Fixed Rate Loans outstanding at any time. You may not have outstanding at any time more than one Fixed Rate Loan that provides for an "Interest Only Minimum Payment" as described in Section VII.3(b) below. Notwithstanding any other provisions of this Section VII.2, you may convert any or all of your Fixed Rate Loans to the balance of your Variable Rate Advances in accordance with Section VI.11(c) above.
 (f) You will be required to pay a Fixed Rate Loan Option Fee in the amount stated in Section IV above for each Fixed Rate Loan that you receive, except as provided in Section IV above. You may pay this fee prior to the making of the Fixed Rate Loan or it will be added to the principal balance of the Fixed Rate Loan.
 (g) Except as stated below, the ANNUAL PERCENTAGE RATE that will apply to each Fixed Rate Loan will be equal to the sum of the FRLO Index stated in Section III above that is in effect on the day you exercise the Fixed Rate Loan Option to obtain that Fixed Rate Loan plus the FRLO Margin stated in Section III above. The ANNUAL PERCENTAGE RATE will be reduced by the amount of any applicable discounts shown in Table C in Section III above. The total discount will be based on the number of discounts that are applicable depending on whether you qualify for a particular discount at the time the ANNUAL PERCENTAGE RATE is determined. A description of these discounts is found in Section VI.5(c). If you do not qualify for a discount(s) when you exercise the Fixed Rate Loan Option, but you subsequently do so, the ANNUAL PERCENTAGE RATE for the Fixed Rate Loan will not be decreased.

If the FRLO Index, or any substitute FRLO Index, becomes unavailable, we will choose a new FRLO Index. The new FRLO Index will have a historical movement substantially similar to that of the prior FRLO Index, and the FRLO Margin will be changed so that the new FRLO Index plus the FRLO Margin will result in an ANNUAL PERCENTAGE RATE that is substantially similar to the ANNUAL PERCENTAGE RATE that would have been in effect at the time the prior FRLO Index becomes unavailable.

The Daily Periodic Rate for the Fixed Rate Loan will be equal to the ANNUAL PERCENTAGE RATE divided by 365 (366 in a leap year). The Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE for the Fixed Rate Loan will not be greater than the maximum rates, and will not be less than the minimum rates, stated in Section III above. The periodic FINANCE CHARGE on the Fixed Rate Loan for each billing period will be a function of the outstanding principal balance of the Fixed Rate Loan each day of the billing period and the applicable Daily Periodic Rate. The outstanding principal balance of the Fixed Rate Loan for each day of the billing period is calculated by starting with the beginning principal balance that day and then subtracting any payments or credits relating to the Fixed Rate Loan received that day. The periodic FINANCE CHARGE that will apply to the Fixed Rate Loan for each billing period will be determined by first multiplying the applicable Daily Periodic Rate by the outstanding principal balance of the Fixed Rate Loan for each day of the billing period and then adding together the resulting amounts.

You will be deemed to exercise a Fixed Rate Loan Option when the FRLO Confirmation provisions in Section III above are completed and you sign this Agreement, when you sign any other required documentation at the time that you sign this Agreement, when you sign the required documentation at one of our Financial Centers, or when you call the toll-free telephone number described in Section III above and provide us with all required information.
 (h) We may, at our sole discretion and without prior notice, provide a Fixed Rate Loan at a Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE that will be lower than the sum of the FRLO Index plus the FRLO Margin as described in accordance with Section VII.2(g). These lower rates are called "Promotional Rates". The Daily Periodic Rate will be equal to the ANNUAL PERCENTAGE RATE divided by 365 (366 in a leap year). If you are provided with Promotional Rates, the ANNUAL PERCENTAGE RATE will be reduced by the amount of any applicable discounts shown in Table C in Section III above. The total discount will be based on the number of discounts that are applicable depending on whether you qualify for a particular discount at the time the ANNUAL PERCENTAGE RATE is determined. A description of these discounts is found in Section VI.5(c). If you do not qualify for a discount(s) when you exercise the Fixed Rate Loan Option, but you subsequently do so, the ANNUAL PERCENTAGE RATE for the Fixed Rate Loan will not be decreased. If we provide a Fixed Rate Loan at Promotional Rates, we are not obligated to offer Promotional Rates on any subsequent Fixed Rate Loans. The amount of the Promotional Rates may change from time to time.

In addition to any Promotional Rates and discounts shown in Table C in Section III above, we may, at our sole discretion and without prior notice, offer you the option to pay a fee ("Buydown Fee") to reduce the rate further on your Fixed Rate

Loan. If we offer and you accept this buydown option, the **ANNUAL PERCENTAGE RATE** that would otherwise be applicable to the Fixed Rate Loan will be reduced and the Daily Periodic Rate will be equal to the reduced **ANNUAL PERCENTAGE RATE** divided by 365 (366 in a leap year). The amount of the Buydown Fee that you must pay, and the amount of the reduction in the **ANNUAL PERCENTAGE RATE**, are stated in Section IV above. At our sole discretion, we reserve the right to charge you a lesser Buydown Fee and/or offer a greater reduction in the **ANNUAL PERCENTAGE RATE** at the time you obtain a Fixed Rate Loan, and this may vary from one Fixed Rate Loan to another. A separate Buydown Fee must be paid for each Fixed Rate Loan that is subject to the buydown option. You must pay the Buydown Fee prior to the making of the Fixed Rate Loan or it will be added to the principal balance of the Fixed Rate Loan. If you prepay the Fixed Rate Loan, none of the Buydown Fee will be returned to you or credited to your Fixed Rate Loan or Credit Line. If we offer you the buydown option for a Fixed Rate Loan, we are not obligated to offer the buydown option for any subsequent Fixed Rate Loans. The reduction in the **ANNUAL PERCENTAGE RATE** resulting from the buydown option will remain in place for the full term of the Fixed Rate Loan, but the **ANNUAL PERCENTAGE RATE** may be increased as otherwise provided in this Section VII.

(i) The current Daily Periodic Rates and corresponding **ANNUAL PERCENTAGE RATES** are specified in Table C in Section III above. These rates will depend on (i) whether you have qualified for one or more discounts, (ii) whether you are being provided with Promotional Rates, or (iii) whether you have both qualified for one or more discounts and are being provided with Promotional Rates.

(j) If you have qualified for one or more discounts in the **ANNUAL PERCENTAGE RATE**, but thereafter you no longer qualify, the discount(s) will be eliminated on the date that you fail to qualify. On that date, the **ANNUAL PERCENTAGE RATE** of each Fixed Rate Loan will increase by the amount of the discount(s) for which you no longer qualify, and the Daily Periodic Rate will increase to the new **ANNUAL PERCENTAGE RATE** divided by 365 (366 in a leap year). For example, if you initially qualified for two discounts, but later qualify for only one discount, the increase in the **ANNUAL PERCENTAGE RATE** will equal the amount by which "2 discounts" exceeds "1 discount" in Table C. However, the increased Daily Periodic Rate and **ANNUAL PERCENTAGE RATE** will not be greater than the maximum rates stated in Section III above.

**3. Choice of Terms and Minimum Payment for the Fixed Rate Loan Option.** You have the following choices regarding the term and Minimum Payment for a Fixed Rate Loan:

(a) *Amortizing Minimum Payment.* With this choice, you may determine the amortization term of each Fixed Rate Loan ("Term") at the time you exercise the Fixed Rate Loan Option. The Term shall be in increments of one (1) year. The maximum permissible Terms available for the Fixed Rate Loan are stated in Table D in Section III above and will depend upon the dollar amount of the Fixed Rate Loan. Your Minimum Payment for the Fixed Rate Loan is the amount sufficient to repay the original principal balance of the Fixed Rate Loan, together with periodic FINANCE CHARGES at the applicable **ANNUAL PERCENTAGE RATE**, in full in substantially equal monthly installments during the Term that you will select at the time you exercise the Fixed Rate Loan Option. The entire outstanding principal balance of the Fixed Rate Loan together with all accrued and unpaid FINANCE CHARGES, if not sooner paid, will be due and payable in full in a single payment on the earlier of the Credit Line Maturity Date or the last day of the scheduled Term. We are not obligated to refinance this amount.

(b) *Interest Only Minimum Payment.* With this choice, you must select one of the terms for the Fixed Rate Loan that is described in Table D in Section III above. You must make this selection at the time you exercise the Fixed Rate Loan Option. Your Minimum Payment will be equal to all of the unpaid periodic FINANCE CHARGES that have accrued on the outstanding principal balance of the Fixed Rate Loan at the applicable **ANNUAL PERCENTAGE RATE**. Your Minimum Payments will not repay any of the outstanding principal balance of the Fixed Rate Loan. At the conclusion of the term of the Fixed Rate Loan, the entire outstanding principal balance of the Fixed Rate Loan, together with all accrued and unpaid FINANCE CHARGES and all other fees and charges relating to the Fixed Rate Loan, automatically will be transferred to the balance of your Variable Rate Advances, which will then accrue FINANCE CHARGES in accordance with Section VI.5 above and be subject to all other provisions of this Agreement relating to Variable Rate Advances. If you choose to pay only the Minimum Payments, then (i) the payments on your Variable Rate Advances may increase substantially following the conclusion of the term of the Fixed Rate Loan, and (ii) the final payment due on the Maturity Date may increase substantially.

You must make your choices regarding a Fixed Rate Loan at the time you exercise the Fixed Rate Loan Option for the loan in accordance with our procedures. You may make a different choice for each Fixed Rate Loan that you obtain.

We will notify you of the amount of the Minimum Payment for the Fixed Rate Loan. If the Fixed Rate Loan has an Amortizing Minimum Payment, your first Minimum Payment may be for a period of less than one month and, if so, we may apply the excess amount of the payment to the outstanding principal balance of the Fixed Rate Loan, which may reduce the amount of your final scheduled payment on the Fixed Rate Loan. Your Minimum Payment on each Fixed Rate Loan is in addition to the Minimum Payments that you must pay on any other Fixed Rate Loans and on the Variable Rate Advances.

**4. Change in Minimum Payment Following Termination of Discount(s).** If you have qualified for one or more discounts in the **ANNUAL PERCENTAGE RATE**, but thereafter you no longer qualify, the discount(s) will be eliminated and the **ANNUAL PERCENTAGE RATE** and Daily Periodic Rate of each Fixed Rate Loan will increase in accordance with Section VII.2(j). Your Minimum Payment will also increase. Your new Minimum Payment will be determined in accordance with the applicable paragraphs of Section VII.3 above, with the exception that (a) the increased **ANNUAL PERCENTAGE RATE** and, (b) if the Fixed Rate Loan has an Amortizing Minimum Payment, the Minimum Payment will be based on the anticipated unpaid principal balance and remaining scheduled Term of the Fixed Rate Loan. For a Fixed Rate Loan with an Amortizing Minimum Payment, the periodic FINANCE CHARGES, the Minimum Payment, and any payment due on the earlier of the Credit Line Maturity Date or the last day of the Term will increase. For a Fixed Rate Loan with an Interest Only Minimum Payment, the periodic FINANCE CHARGES, the Minimum Payment, the balance transferred to your Variable Rate Advances at the conclusion of the Fixed Rate Loan, the amount of the Minimum Payments due on the Variable Rate Advances, and the final payment due on the Maturity Date will increase. We will notify you of the amount of the new Minimum Payment for the Fixed Rate Loan.

**5. Special Terms.** In our sole discretion, we may offer you special terms on Fixed Rate Loans from time to time. The special terms may include, by way of example, reduced rates, reduced fees, and reduced payments. The special terms may be available for temporary periods of time and on a limited basis.

**6. Conflicts.** In the event of any conflict or inconsistency between the provisions of this Agreement and the remaining provisions of this Agreement, the provisions of this Section VII shall prevail. Except as otherwise provided in this Section VII, all remaining provisions of this Agreement shall apply to the Fixed Rate Loans in accordance with their terms.

## VIII. BILLING RIGHTS

**YOUR BILLINGS RIGHTS**
**KEEP THIS NOTICE FOR FUTURE USE**
This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

*Notify Us in Case of Errors or Questions About Your Bill.* If you think your bill is wrong, or if you need more information about a transaction on your bill, write us (on a separate sheet) at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:
- Your name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your deposit account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic payment is scheduled to occur.

*Your Rights and Our Responsibilities After We Receive Your Written Notice.* We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question or report you as delinquent. We can continue to bill you for the amount you question, including FINANCE CHARGES, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. If we find that we made a mistake on your bill, you will not have to pay any FINANCE CHARGES related to any questioned amount. If we did not make a mistake, you may have to pay FINANCE CHARGES and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date on which it is due.

If you fail to pay the amount that we think you owe, we may

1456

report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we do not follow these rules, we cannot collect the first $50.00 of the questioned amount, even if your bill was correct.

*Special Rule for Credit Card Purchases.* If you have a problem with the quality of property or services that you purchased with a credit card and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or the services. There are two limitations on this right:

(a) You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address; and

(b) The purchase price must have been more than $50.00.

These limitations do not apply if we own or operate the merchant or if we mailed you the advertisement for the property or services.

## SIGNATURES

By signing below, you agree to the terms of this Agreement and you acknowledge that you have read and received a copy of this Agreement.

_____
CHRISTOPHER R SMITH

Pay to the order of

Without Recourse
Washington Mutual Bank

_____
Cynthia A Riley, Vice President

 

**This page is part of your document - DO NOT DISCARD**



## 20080502807    Pages: 009

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

03/24/08 AT 02:05PM

| | |
|---|---|
| Fee: | 34.00 |
| Tax: | 0.00 |
| Other: | 0.00 |
| Total: | 34.00 |

1760141    200803240130128    Mail

**TITLE(S) :** _____



L E A D      S H E E T

**Assessor's Identification Number (AIN)**
**To be completed by Examiner OR Title Company in black ink.**      **Number of AIN's Shown**

‐      ‐

      **THIS FORM IS NOT TO BE DUPLICATED**      

 1456 . √

Recording requested by and
when recorded return to:
WASHINGTON MUTUAL BANK
FISERV LENDING SOLUTIONS
600 A N. JOHN RHODES BOULEVARD
MELBOURNE, FL 32934-9197
ATTN: QUICK CLOSE DEPT

03/24/08



20080502807

**Washington Mutual**

**WaMu Equity Plus™**
**DEED OF TRUST**
Loan Number: ████1456

THIS DEED OF TRUST is between:
CHRISTOPHER R SMITH AND PATRICIA SMITH

whose address is:
   10115 TOLUCA LAKE AVE  TOLUCA LAKE, CA 91602-2925
("Trustor");    CALIFORNIA RECONVEYANCE COMPANY    , a    CALIFORNIA
corporation, the address of which is:
   9200 OAKDALE AVENUE  CHATSWORTH, CA 91311
and its successors in trust and assigns ("Trustee"); and
WASHINGTON MUTUAL BANK, A FEDERAL ASSOCIATION, WHICH IS ORGANIZED AND
EXISTING UNDER THE LAWS OF THE UNITED STATES OF AMERICA AND WHOSE ADDRESS IS
2273 N GREEN VALLEY PARKWAY, SUITE #14, HENDERSON, NV 89014 ("BENEFICIARY") AND
ITS SUCCESSORS OR ASSIGNS.
   1.  **Granting Clause.**  Trustor hereby grants, bargains, sells and conveys to Trustee in
trust, with power of sale, the real property in _____ LOS ANGELES _____ County, California,
described below and all interest in it Trustor ever gets:
SEE ATTACHED EXHIBIT A



SMITH, CHRISTOPHER

Record and Return To:
United General Title Ins
Fiserv—P.O. BOX 2590
Chicago, IL 60690

Tax  Parcel  Number:_____ SEE ATTACHED EXHIBIT A _____  together  with  all
insurance and condemnation proceeds related to it; all plumbing, lighting, air conditioning and
heating apparatus and equipment; and all  fencing, blinds, drapes, floor coverings, built-in

4 3 6 0 (01/24/07) w8.2

Page 1 of 7

1456

appliances and other fixtures at any time installed on or in or used in connection with such real property.

All of the property described above will be called the "Property". As used herein "State" shall refer to the state of California.

2. **Obligation Secured.** This Deed of Trust is given to secure performance of each promise of Trustor contained herein and in a _____WaMu Equity Plus(TM)_____ Agreement and Disclosure with Beneficiary of even date herewith with a maximum credit limit of _____$150,000.00_____ (the "Credit Agreement"), including any extensions, renewals or modifications thereof, and repayment of all sums borrowed by Trustor under the Credit Agreement, with interest from the date of each advance until paid at the rates provided therein. The Credit Agreement provides for variable and fixed rates of interest. Under the Credit Agreement, the Trustor may borrow, repay and re-borrow from time to time, up to the maximum credit limit stated above, and all such advances shall be secured by the lien of this Deed of Trust. This Deed of Trust also secures payment of certain fees and charges payable by Trustor under the Credit Agreement, certain fees and costs of Beneficiary as provided in Section 9 of this Deed of Trust, and repayment of money advanced by Beneficiary to protect the Property or Beneficiary's interest in the Property, including advances made pursuant to Section 6 below. The Credit Agreement provides that unless sooner repaid, all amounts due under the Credit Agreement are due and payable in full thirty (30) years from the date of this Deed of Trust (the "Maturity Date"). All amounts due under the Credit Agreement and this Deed of Trust are called the "Debt".

3. **Representations of Trustor.** Trustor represents that:
    (a)   Trustor is the owner of the Property, which is unencumbered except by: easements, reservations, and restrictions of record not inconsistent with the intended use of the Property and any existing first mortgage or deed of trust given in good faith and for value, the existence of which has been disclosed in writing to Beneficiary; and
    (b)   The Property is not presently and will not during the term of this Deed of Trust be used for any agricultural purposes.

4. **Promises of Trustor.** Trustor promises:
    (a)   To keep the Property in good repair and not to remove, alter or demolish any of the improvements on the Property, without first obtaining Beneficiary's written consent;
    (b)   To allow representatives of Beneficiary to inspect the Property at any reasonable hour, and to comply with all laws, ordinances, regulations, covenants, conditions and restrictions affecting the Property;
    (c)   To pay on time all lawful taxes and assessments on the Property;
    (d)   To perform on time all terms, covenants and conditions of any prior mortgage or deed of trust covering the Property or any part of it and pay all amounts due and owing thereunder in a timely manner;
    (e)   To see to it that this Deed of Trust remains a valid lien on the Property superior to all liens except those described in Section 3(a), and to keep the Property free of all encumbrances which may impair Beneficiary's security;
    (f)   To keep the improvements on the Property insured by a company satisfactory to Beneficiary against fire and extended coverage perils, and against such other risks as Beneficiary may reasonably require, in an amount equal to the full insurable value of the improvements, and to deliver evidence of such insurance coverage to Beneficiary. Subject to the rights of the holder of any lien described in 3(a), Beneficiary shall be named as the loss payee on all such policies pursuant to a standard lender's loss payable clause. The amount collected under any insurance policy shall

4 3 6 0 (01/24/07) w8.2                                                      Page 2 of 7



1456

be applied to the repair of such improvements, unless doing so would impair Beneficiary's security, in which event such proceeds may be applied upon any indebtedness hereby secured. In the event of foreclosure or sale of the Property pursuant to the Trustee's power of sale, all rights of the Trustor in insurance policies then in force shall pass to the purchaser at the Sheriff's or Trustee's sale.

    (g)  To sign all financing statements and other documents that Beneficiary may request from time to time to perfect, protect and continue Beneficiary's security interest in the Property. Trustor irrevocably appoints Beneficiary as Grantor's attorney-in-fact to execute, file and record any financing statements or similar documents in Trustor's name and to execute all documents necessary to transfer title if there is a default; and

    (h)  To advise Beneficiary immediately in writing of any change in Trustor's name, address or employment.

    **5.  Sale, Transfer or Further Encumbrance of Property.**  Subject to applicable law, the entire Debt shall become immediately due and payable in full upon sale or other transfer of the Property or any interest therein by Trustor by contract of sale or otherwise including, without limit, any further encumbrance of the Property.

    **6.  Curing of Defaults.**  If Trustor fails to comply with any of the covenants in Section 4, including all the terms of any prior mortgage or deed of trust, Beneficiary may take any action required to comply with any such covenants without waiving any other right or remedy it may have for Trustor's failure to comply. Repayment to Beneficiary of all the money spent by Beneficiary on behalf of Trustor shall be secured by this Deed of Trust; at Beneficiaries option, advance may be made against the Credit Agreement to pay amounts due hereunder; such shall not relieve Beneficiary from liability for failure to fulfill the covenants in Section 4. The amount spent shall bear interest at the rates from time to time applicable under the Credit Agreement and be repayable by Trustor on demand. Although Beneficiary may take action under this paragraph, Beneficiary is not obligated to do so.

    **7.  Remedies For Default.**

    (a)  Prompt performance under this Deed of Trust is essential. If Trustor does not pay any installment of the Debt or other amount due hereunder on time, or any other event occurs that entitles Beneficiary to declare the unpaid balance of the Debt due and payable in full under the Credit Agreement, or if Trustor fails to comply with any other term, condition, obligation or covenant contained in the Credit Agreement or this Deed of Trust or any rider thereto, or any other deed of trust, mortgage, trust indenture or security agreement or other instrument having priority over this Deed of Trust, or if any representation of Trustor herein was false or misleading, the Debt and any other money whose repayment is secured by this Deed of Trust shall immediately become due and payable in full, at the option of Beneficiary, and the total amount owed by Trustor shall thereafter bear interest at the rate(s) stated in the Credit Agreement. Beneficiary may then or thereafter advise Trustee of the default and of Beneficiary's election to have the Property sold pursuant to Trustee's power of sale in accordance with applicable law and deliver to Trustee any documentation as may be required by law. After giving any notices and the time required by applicable law, Trustee shall sell the Property, either in whole or in separate parcels or other part, and in such order as Trustee may choose, at public auction to the highest bidder for cash in lawful money of the United States which will be payable at the time of sale all in accordance with applicable law. Anything in the preceding sentence to the contrary notwithstanding, Beneficiary may apply the Debt towards any bid at any such sale. Trustee may postpone any such sale by providing such notice as may be required by law. Unless prohibited by law, any person, including the Trustor, Beneficiary or Trustee, may purchase at any such sale. Trustee shall apply the

4 3 6 0 (01/24/07) w8.2                                                                          Page 3 of 7

1456

proceeds of the sale as follows: (i) to the expenses of the sale, including a reasonable trustee's fee and lawyer's fee; (ii) to the obligations secured by this Deed of Trust; and, (iii) the surplus, if any, shall go to the person(s) legally entitled thereto.

(b)   Trustee shall deliver to the purchaser at the sale its deed, without warranty, which shall convey to the purchaser the interest in the Property which Trustor had or had the power to convey at the time of execution of this Deed of Trust and any interest which Trustor subsequently acquired. The Trustee's deed shall recite the facts showing that the sale was conducted in compliance with all the requirements of law and of this Deed of Trust. This recital shall be prima facie evidence of such compliance and conclusive evidence of such compliance in favor of bona fide purchasers and encumbrancers for value.

(c)   To the extent permitted by law the power of sale conferred by this Deed of Trust is not an exclusive remedy. In connection with any portion of the Property which is personal property, Beneficiary shall further be entitled to exercise the rights of a secured party under the Uniform Commercial Code as then in effect in the state of California.

(d)   By accepting payment of any sum secured by this Deed of Trust after its due date, Beneficiary does not waive its right to require prompt payment when due of all other sums so secured or to declare default for failure to so pay.

8.   **Condemnation; Eminent Domain.** In the event any portion of the Property is taken or damaged in an eminent domain proceeding, the entire amount of the award, or such portion as may be necessary to fully satisfy the Debt, shall, except as required by applicable law, be paid to the Debt.

9.   **Fees and Costs.** Trustor shall pay Beneficiary's and Trustee's reasonable cost of searching records, other reasonable expenses as allowed by law, and reasonable attorney's fees, in any lawsuit or other proceeding to foreclose this Deed of Trust; in any lawsuit or proceeding which Beneficiary or Trustee prosecutes or defends to protect the lien of this Deed of Trust; and, in any other action taken by Beneficiary to collect the Debt, including without limitation any disposition of the Property under the State Uniform Commercial Code; and, any action taken in bankruptcy proceedings as well as any appellate proceedings.

10.   **Reconveyance.** Trustee shall reconvey the Property to the person entitled thereto, on written request of Beneficiary, or following satisfaction of the obligations secured hereby and Beneficiary and Trustee shall be entitled to charge Trustor a reconveyance fee together with fees for the recordation of the reconveyance documents unless prohibited by law. If your Credit Line is cancelled or terminated, subject to applicable law, we may delay the cancellation or reconveyance of your security instrument for a reasonable period of time to enable us to post to your Credit Line Account any advances that you have received.

11.   **Trustee; Successor Trustee.** Beneficiary may, unless prohibited by law, appoint a successor Trustee from time to time in the manner provided by law. The successor Trustee shall be vested with all powers of the original trustee. The Trustee is not obligated to notify any party hereto of a pending sale under any other deed of trust or of any action or proceeding in which Trustor, Trustee or Beneficiary shall be a party unless such action or proceeding is brought by the Trustee.

12.   **Savings Clause.** If a law, which applies to this Deed of Trust or the Credit Agreement and which sets maximum loan charges, is finally interpreted by a court having jurisdiction so that the interest or other loan charges collected or to be collected in connection with this Deed of Trust or the Credit Agreement exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already



1456

collected from Trustor which exceeded permitted limits will be refunded to Trustor. Beneficiary may choose to make this refund by reducing the principal owed or by making a direct payment. If a refund reduces the principal, the reduction will be treated as a partial prepayment.

13. **Miscellaneous.** This Deed of Trust shall benefit and obligate the heirs, devisees, legatees, administrators, executors, successors, and assigns of the parties hereto. The term "Beneficiary" shall mean the holder and owner of the Credit Agreement secured by this Deed of Trust, whether or not that person is named as Beneficiary herein. The words used in this Deed of Trust referring to one (1) person shall be read to refer to more than one (1) person if two (2) or more have signed this Deed of Trust or become responsible for doing the things this Deed of Trust requires. This Deed of Trust shall be governed by and construed in accordance with Federal law and, to the extent Federal law doesn't apply, the laws of the state of California. If any provision of this Deed of Trust is determined to be invalid under law, the remaining provisions of this Deed of Trust shall nonetheless remain in full force and effect.

14. **Beneficiary and Similar Statements.** Beneficiary may collect a fee in the maximum amount allowed by law for furnishing any beneficiary statement, payoff demand statement or similar statement.

15. **Riders.** If one (1) or more riders are executed by Trustor and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)]

☐ Condominium Rider                    ☐ Other: _____
                                                                    (specify)

☐ Planned Unit Development Rider

1456

By signing below Trustor accepts and agrees to the provisions of this Deed of Trust and of any rider(s) executed by Trustor concurrently therewith.

DATED at *Burbank* , *California* this *21st* day of *September* , *2001* .

TRUSTOR(S):

_____
CHRISTOPHER R SMITH

_____
PATRICIA SMITH

1456

STATE OF CALIFORNIA

COUNTY OF _Los Angeles_

On _9/21/07_ before me, _Linda Franco_ , Notary Public,
(here insert name)

personally appeared
CHRISTOPHER R SMITH
PATRICIA SMITH

_____

_____

_____

_____

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s)
whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on
the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the
instrument.

WITNESS my hand and official seal.

Signature: _____

My Commission expires: _Feb 26, 2009_

My Commission number: _1555163_

(Seal or Stamp)

LINDA FRANCO
Commission # 1555163
Notary Public - California
Los Angeles County
My Comm. Expires Feb 26, 2009

## REQUEST FOR FULL RECONVEYANCE
Do not record. To be used only when Trustor's
indebtedness has been repaid and Credit Agreement cancelled.

TO: TRUSTEE _____

The undersigned is Trustee of the within Deed of Trust, and the legal owner and holder of the
___WaMu Equity Plus(TM)___ Agreement secured thereby. Said Deed of Trust is hereby surrendered
to you for reconveyance and you are requested, upon payment of all sums owing to you, to
reconvey, without warranty, to the person(s) entitled thereto, the right, title and interest now held
by you thereunder.

DATE: _____

WASHINGTON MUTUAL BANK

By _____

Its _____

4 3 6 0 (01/24/07) w8.2                                                        Page 7 of 7

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: **15233 Ventura Blvd., Suite 250, Sherman Oaks, CA 91403.**

A true and correct copy of the foregoing document entitled **NOTICE OF MOTION AND MOTION FOR ORDER DETERMINING VALUE OF COLLATERAL [11 U.S.C. § 506(a), FRBP 3012]** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

## I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING**

**("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **11/5/2014** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☐ Service information continued on attached page.

- **Melanie Scott Green**    Melanie.green@usdoj.gov
- **M Jonathan Hayes**    jhayes@srhlawfirm.com,
  roksana@srhlawfirm.com;matthew@srhlawfirm.com;rosarioz@srhlawfirm.com;jfisher@srhlawfirm.com;maria@srhlawfirm.com;staci@srhlawfirm.com;jhayesecf@gmail.com;sevan@srhlawfirm.com
- **Gina J Kim**    gjkim@piteduncan.com,
  ecfcacb@piteduncan.com;GJK@ecf.inforupcty.com
- **John H Kim**    jkim@cookseylaw.com
- **Matthew D Resnik**    matt@srhlawfirm.com,
  mattecf@gmail.com;renee@srhlawfirm.com
- **Cassandra J Richey**    cmartin@pralc.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov

## II. **SERVED BY U.S. MAIL:** On **11/5/2014** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**Debtor's Copy**
Christopher R. Smith
10155 Toluca Lake Avenue
Toluca Lake, CA  91602

///

///

///

///

///

**SIMON RESNIK
HAYES LLP**

**III. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served):
Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **11/5/2014** I served the following person(s) and/or entity(ies) by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**Judge's Copy:**
Hon. Julia W. Brand
US Bankruptcy Court
255 E. Temple Street, Suite 1382
Los Angeles, CA 90012

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 11/5/2014 | Ja'Nita Fisher | /s/ Ja'Nita Fisher |
|-----------|----------------|--------------------|
| *Date* | *Type Name* | *Signature* |

SIMON RESNIK
HAYES LLP

(Attached page to Proof of Service-please include any additional or alternative addresses and attach additional pages if needed)(Certified Mail required for service on a national bank.)

| (Name of 1st Lienholder)<br>Chase Bank,NA<br><br>Agent for Service of Process<br>(Name & Address)<br>PO Box 24696<br>Columbus, OH 43224 | Address from:<br>☐ Proof of Claim<br>☐ Secretary of State<br>☐ FDIC website<br>☒ Other: (Specify)<br>Schedules Address | Delivery method:<br>☐ US Mail<br>☒ Certified mail – Tracking #<br>☐ Overnight mail – Tracking #<br>  Carrier Name: |
| --- | --- | --- |
| (Name of 1st Lienholder)<br>Chase Bank, NA<br><br>Agent for Service of Process<br>(Name & Address)<br>4 Chase Metrotech Ctr<br>Brooklyn, NY 11245 | Address from:<br>☐ Proof of Claim<br>☒ Secretary of State<br>☐ FDIC website<br>☐ Other: (Specify) | Delivery method:<br>☐ US Mail<br>☒ Certified mail – Tracking #<br>☐ Overnight mail – Tracking #<br>  Carrier Name: |
| (Name of 1st Lienholder)<br>Chase Bank, NA<br><br>Agent for Service of Process<br>(Name & Address)<br>C T Corporation System<br>818 West Seventh St, 2nd Floor<br>Los Angeles, CA 90017 | Address from:<br>☐ Proof of Claim<br>☒ Secretary of State<br>☐ FDIC website<br>☐ Other: (Specify) | Delivery method:<br>☐ US Mail<br>☒ Certified mail – Tracking #<br>☐ Overnight mail – Tracking #<br>  Carrier Name: |

| (Name of 2nd Lienholder)<br>Chase Bank, NA<br><br>Agent for Service of Process<br>(Name & Address)<br>Five Lakes Agency, Inc.<br>JP Morgan Chase Bank<br>PO Box 80730<br>Rochester, MI 48308 | Address from:<br>☒ Proof of Claim<br>☒ Secretary of State<br>☐ FDIC website<br>☒ Other: (Specify)<br>Schedules Address | Delivery method:<br>☐ US Mail<br>☒ Certified mail – Tracking #<br>☐ Overnight mail – Tracking #<br>  Carrier Name: |
| --- | --- | --- |
| (Name of 2nd Lienholder)<br>Chase Bank, NA<br><br>Agent for Service of Process<br>(Name & Address)<br>Jamie Dimon, President<br>201 North Walnut Street<br>Wilmington, DE 19801 | Address from:<br>☐ Proof of Claim<br>☐ Secretary of State<br>☒ FDIC website<br>☐ Other: (Specify) | Delivery method:<br>☐ US Mail<br>☒ Certified mail – Tracking #<br>☐ Overnight mail – Tracking #<br>  Carrier Name: |
| (Name of 2nd Lienholder)<br>Chase Bank, NA<br><br>Agent for Service of Process<br>(Name & Address)<br>Five Lakes Agency, Inc.<br>CSC Lawyer Incorporating Service<br>2710 Gateway Oaks Dr, Suite 150N<br>Sacramento, CA 95833 | Address from:<br>☐ Proof of Claim<br>☒ Secretary of State<br>☐ FDIC website<br>☐ Other: (Specify) | Delivery method:<br>☐ US Mail<br>☒ Certified mail – Tracking #<br>☐ Overnight mail – Tracking #<br>  Carrier Name: |